*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0073p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 04-4191

IRWIN A. DILLARD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 04-00034—Donald C. Nugent, District Judge.

Argued: January 31, 2006

Decided and Filed: February 27, 2006

Before: COLE, GIBBONS, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** William L. Dawson, Beachwood, Ohio, for Appellant. Rebecca Lutzko, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** William L. Dawson, Beachwood, Ohio, for Appellant. David P. Folmar, Jr., ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

_____

## OPINION

_____

ROGERS, Circuit Judge. Defendant-Appellant Irwin Dillard appeals his conviction and sentence for conspiracy to distribute crack cocaine in violation of 21 U.S.C. § 846 and possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1). After Dillard was arrested by the Cleveland Police Department (CPD) in connection with a drug sale, officers drove to his duplex, obtained the consent of his girlfriend, Arion Holton, to search his apartment, and discovered crack cocaine. On appeal, Dillard contends that: (1) the district court erred when it failed to credit Holton's testimony that the officers used Dillard's key to enter the front door of the duplex, entered the apartment unannounced, and forced her to consent to the search; (2) the district court erred when it ruled that the officers did not violate the Fourth Amendment by entering the unlocked common hallway of the duplex; and (3) his case should be remanded for resentencing in light of *United States v. Booker*, 543 U.S. 220 (2005). For the reasons set forth below, we affirm.

## I.

On January 13, 2004, a CPD informant made an undercover drug purchase from Eugene Robertson. While waiting in the informant's car for Robertson to arrive with the drugs, the informant and an undercover police officer received a telephone call from Robertson asking them to follow a red car ahead. The officer, however, directed the informant not to follow the red car. A short time later, Robertson approached the informant's car on foot. Robertson sold the informant one ounce of crack cocaine for $900.

After the sale, officers observed Robertson getting into the passenger door of a blue Chevrolet Suburban. The officers followed the Suburban for two blocks and pulled it over. Robertson and the driver, Irwin Dillard, were arrested. The officers found $780 of the previously-recorded buy money on Dillard and $120 of the money on Robertson. The officers also discovered that the Suburban was registered to Arion Holton of 12815 Iroquois Avenue.

CPD officers then traveled approximately ten blocks to Holton's residence. Holton lived with Dillard in a two-story duplex. At the front of the building there were a porch, two mailboxes, and a front door. The testimony at the suppression hearing did not establish whether there was a doorbell. Raymond James, the first floor resident and landlord, testified at the hearing that the front door was always locked, but Dillard had a key.

The front door of the duplex led to a common hallway. The door to James's apartment was on the right side of the hallway. On the left side there was a door that led to a stairway to the second floor. James testified that this door was also always locked. At the top of the stairway was the door to Holton's and Dillard's apartment. James testified that there was no lock on the door to the actual apartment; Holton and Dillard apparently relied on the two first floor doors for security. Holton, Dillard, and James generally used a side door to enter their apartments instead of the common hallway in front.

When the CPD officers arrived, they spotted the same red car from the scene of the drug purchase parked on the street outside of the duplex. The officers questioned the driver and learned that, although the driver had given Robertson a ride to the location of the sale, he did not know that Robertson had planned to sell drugs. The officers then entered the duplex. At this point, the suppression hearing testimony of the police officers and Holton diverges.

### A.     Police Testimony

According to police witnesses who testified at the suppression hearing, the officers who approached the front door of the duplex found the front door open by about twelve inches. The officers then entered the common hallway. The door to the stairway on the left was also open, and the officers climbed the stairs to Holton's apartment and knocked. Holton answered and invited the officers into the apartment.

As the officers entered Holton's living room, they immediately smelled a strong odor of cocaine and observed crack cocaine on a bar in the dining room. The officers advised Holton of her *Miranda* rights and asked for her consent to search the apartment. Holton appeared "a little surprised" but was cooperative and relatively calm. Holton read and signed a consent-to-search form. The officers then searched the apartment and found crack cocaine in a green vase and on a plate on top of a kitchen cabinet. The officers found approximately 293 grams of crack cocaine in the apartment. They also found marijuana, a scale, and plastic bags on the dining room table. At some point, Holton also gave the following written statement:

> I have known [Dillard] for about five years. . . . None of the drugs found belong to
> me. The hiding place that I was aware of was the green vase on top of the shelf in

the living room.  I was unaware of any other hiding place or either drugs or money.  I normally didn't see drug activity from the home but when there was activity, I would say $50 to $100 was collected that I know of per sale of crack.

## B.    Arion Holton's Testimony

According to Holton's testimony at the hearing, the officers did not simply enter the open front door on the first floor, but rather used Dillard's keys, obtained during his arrest, to unlock the door and enter the apartment unannounced.  While lying in bed, Holton heard voices in the living room.  She got out of bed and found five or six officers in her dining room.  The officers, with guns drawn, ordered her to put her hands in the air.  One officer told her that she was going to jail for ten years, that she was going to have her baby in jail, and that the government would take her daughter.  Another officer said that if Holton did not cooperate they would take her to jail, but if she signed a consent form they would leave her alone.  An officer also told her that if she did not sign the consent form the officers would stay until they obtained a warrant.

Seated at the dining room table and surrounded by several officers, Holton signed the consent form.  Holton testified that she signed the form only to avoid being arrested.  She also testified that she signed the form without reading it or having it read to her by the officers.  Although she acknowledged making the written statement, she maintained that the officers ordered her to write the statement and told her specifically what to include.

Holton denied ever having observed any drugs or drug activity in her apartment.  She testified that she never smelled the odor of cocaine.  She did not see any crack on the bar in the dining room or on top of the kitchen cabinet because she was sitting at the table and her back was turned away from the kitchen when the officers discovered the drugs.  Although she was seated at the dining room table when she signed the consent form, Holton denies ever seeing the marijuana, scale, or plastic bags on the table.

## II.

Dillard was indicted for conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846, distribution of cocaine base in violation of 21 U.S.C. § 841(a)(1), and possession with intent to distribute cocaine base in violation of 21 U.S.C. § 841(a)(1).  In March 2004, Dillard filed a motion to suppress the evidence obtained from the search of his duplex apartment at 12815 Iroquois Avenue.  In his memorandum in support, Dillard argued that the CPD officers violated the Fourth Amendment by using his key to enter the duplex and making an unannounced, warrantless entry into his apartment.  He further argued that Holton's consent was invalid because it was obtained only after the officers illegally entered his apartment and because the consent was not given voluntarily.  According to Dillard, the officers coerced Holton to consent when they entered unannounced with guns drawn and threatened her with arrest if she did not sign the form.

After a three-day suppression hearing, the district court denied Dillard's motion to suppress.  The court noted the conflicting accounts of the search but found the testimony of the officers to be the more credible.  The court found Holton's testimony less credible because, among other things, (1) Holton testified that she had never seen evidence of drug activity in the apartment even though drugs and drug paraphernalia were scattered throughout, and (2) Holton signed the consent form in two places and made a written statement concerning Dillard's drug dealing.  Moreover, although James testified that the front door was always locked, he also testified that when he heard police outside he peered out and saw the front door open.  Because the court adopted the officers' version, it found that the front door had been open when the officers arrived and that Holton had voluntarily consented to the search.  Because the court found that the front door had been open, the court ruled that Dillard had no privacy interest in the common area of the duplex and thus that the officers did

not violate the Fourth Amendment when they entered the common hallway and climbed the stairs to Dillard's door on the second floor.

In June 2004, Dillard entered a plea of guilty to two counts: conspiracy to distribute 5 grams or more of crack cocaine and possession with intent to distribute 50 grams or more of crack cocaine. Paragraphs 18 and 19 of the plea agreement set forth the factual basis for the plea and stipulated that (1) the drug buy involved 28 grams of cocaine base, (2) Dillard was subsequently found to possess the buy money, and (3) officers found 293 grams of cocaine base in Dillard's apartment. Paragraph 7 of the plea stipulated that the amount of cocaine base that Dillard conspired to distribute was at least 150 grams, but less than 500 grams, establishing a base offense level of 34. Paragraph 10 stipulated to a three-level reduction for acceptance of responsibility. Thus, the plea agreement contemplated an agreed base offense level of 31, with an unknown criminal history category.

Although the plea agreement reserved Dillard's right to appeal the denial of his motion to suppress, paragraph 16 waived Dillard's right otherwise to appeal the conviction or sentence. Dillard had the right to appeal his sentence only if the sentence was inconsistent with the provisions of the plea agreement.

Dillard was sentenced in August 2004. During the sentencing hearing, the district court determined the appropriate Guideline range based upon a total offense level of 31 (as contemplated by the plea agreement), with a criminal history category of II. Thus, the guideline range was 121-51 months. Dillard's counsel asked the court, in light of the uncertain status of the Sentencing Guidelines, to consider sentencing Dillard below the statutory minimum. The district court replied, "[f]irst of all, I think the Guidelines do apply, and even if they didn't, I would impose a sentence that is suggested by the guideline range based on a number of factors." The court then analyzed the factors relevant to the sentence, including the circumstances of the case, Dillard's criminal history, his use of drugs, and his acceptance of responsibility. Based on these factors, the court sentenced Dillard to 128 months of imprisonment, followed by five years of supervised release.

### III.

#### A.     The District Court's Factual Findings

The district court's findings that the doors of Dillard's duplex were open and that the CPD officers did not use Dillard's key to gain entry, that Holton invited the officers into the apartment, and that Holton voluntarily consented to the search of the apartment are not clearly erroneous because those findings were based on the court's credibility determinations and do not contradict the record. In reviewing the denial of a motion to suppress, this court reviews findings of fact for clear error and conclusions of law de novo. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000). "A factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). Furthermore, the evidence must be reviewed "'in the light most likely to support the district court's decision.'" *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994) (quoting *United States v. Gomez*, 846 F.2d 557, 560 (9th Cir. 1988)).

The district court in this case essentially adopted the police version of events. Dillard claims that the district court erred with regard to three factual findings. First, Dillard alleges that the CPD officers did not find the front door of the duplex open, but rather used Dillard's key to let themselves in. Second, Dillard claims that the officers did not knock or obtain Holton's permission before entering the second floor door of his apartment. Instead, Dillard alleges that the officers walked in unannounced. Finally, Dillard alleges that Holton's consent to search the apartment was not voluntary because

there were four officers who entered the home unannounced with guns drawn, Ms[.] Holton was a young pregnant woman in fear for her safety being harassed. The detention was for an extended period of time and, based on the unannounced presence of the officers in the home, Ms. Holton had no knowledge that she court [sic], or even had a chance to refuse the officers entrance.

Dillard relies entirely on Holton's testimony at the suppression hearing to support these claims.

Dillard's claims do not succeed, however, because the district court made findings of fact based upon the credibility of the witnesses at the suppression hearing. Officers Kirk Johns and Michael Rinkus testified that the front door of the duplex was ajar, that Holton let them into the apartment after they knocked, and that Holton voluntarily consented to the search of the apartment. The district court, believing that Holton lied about seeing drugs in the apartment, credited the officers' testimony over that of Holton. Because the district court was "in the best position to judge credibility," *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996), and because "this court accords great deference to such credibility determinations," *Navarro-Camacho*, 186 F.3d at 705, the district court did not clearly err by crediting the officers' testimony rather than that of Holton.

A district court's credibility determination carries great weight, and some of this court's cases appear to defer to the district court on that basis alone. *See, e.g.*, *Bradshaw*, 102 F.3d at 210 (holding that it was not clearly erroneous for the district court to accept the police testimony and articulate, on its own, plausible explanations for apparent inconsistencies in the testimony). This is not to say, however, that a credibility determination will shield a district court's decision in every case. In applying the clearly erroneous standard, we have also looked at whether testimony is inconsistent or otherwise contradicts the record. *See, e.g.*, *United States v. Foster*, 376 F.3d 577, 583-84 (6th Cir. 2004).

In this case, the district court's adoption of the police version is not clearly erroneous because the officers' testimony does not contradict the record. Dillard offers no evidence beyond Holton's testimony to support his version of the search. Although James, the landlord and first floor resident, testified that the two first floor doors were always locked, as the district court reasoned, Dillard or Robertson could have left the doors open to make it easier to enter after the drug sale. Moreover, James's testimony—that, when he heard the police outside the front of the duplex, he peered out his door and saw that the front door was open—is not inconsistent with the officers' testimony because James could not say whether the door was open before or after the police arrived. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985).

In *United States v. Ivy*, for example, the defendant argued that police shoved him and entered his home without his consent, making the subsequent search illegal. 165 F.3d 397, 400 (6th Cir. 1998). The officers, on the other hand, testified that the defendant voluntarily let them in. *Id.* at 399. The district court adopted the police version. *Id.* at 400. The district court found the defendant less credible because the court believed that the defendant had lied about the origin of a large sum of money discovered by officers. *Id.* On appeal, this court affirmed the district court's finding that the defendant consented to the officers' entry. *Id.* at 402. We held that, because the district court's decision rested on a credibility determination, and because the police version was one of two permissible views of the evidence, the district court's finding was not clearly erroneous. *Id.*

For the same reasons, the district court's factual findings in this case were not clearly erroneous. Thus, we will assume that (1) the police officers found both doors on the first floor of Dillard's duplex unlocked and open, (2) the officers knocked and were let into the apartment voluntarily by Holton, and (3) Holton voluntarily consented to the search of the apartment.

## B.        Dillard's Fourth Amendment Expectation of Privacy

Under these facts, the police officers did not violate the Fourth Amendment. Holton let the officers into the apartment and consented to the search. Although a consent form, signed after a Fourth Amendment violation, cannot be relied upon to cure an otherwise illegal search, *see United States v. Lewis*, 231 F.3d 238, 241 (6th Cir. 2000), no such violation is present in this case. The officers did not violate the Fourth Amendment when they entered Dillard's duplex and walked to the second floor because Dillard did not have a reasonable expectation of privacy in the common hallway and stairway of his duplex that were unlocked and open to the public.[1]

The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). A person has an expectation of privacy if he has a subjective expectation of privacy, and if society is prepared to recognize that expectation as objectively reasonable. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). In analyzing whether a subjective expectation of privacy is objectively reasonable, this court considers a number of factors: (1) whether the defendant was legitimately on the premises; (2) his proprietary or possessory interest in the place to be searched or the item to be seized; (3) whether he had the right to exclude others from the place in question; and (4) whether he had taken normal precautions to maintain his privacy. *See United States v. King*, 227 F.3d 732, 744 (6th Cir. 2000).

There is no question that Dillard, as a tenant, had a possessory interest in the common hallway and stairway of his duplex and the right generally to exclude anyone who was not a tenant. But because Dillard made no effort to maintain his privacy in the common hallway and stairway, he did not have an objectively reasonable expectation of privacy in those areas. Both doors on the first floor were not only unlocked but also ajar. By not locking the duplex's doors, Dillard did nothing to indicate to the officers that they were not welcome in the common areas.

Moreover, without being able to pass through the hallway and stairway, there was no visible way for the police or anyone else to alert the duplex tenants of their presence. There was no intercom system, and Holton testified that she was not sure if there was a doorbell. Perhaps the officers could have used the side door, but we are not prepared to impose a burden on police officers to walk around apartment buildings in search of a different entrance when the front entrance is unlocked. How would officers ever know which entrance is the "right" entrance for Fourth Amendment purposes? Nothing in these circumstances indicates that Dillard had a reasonable expectation of privacy in the hallway and stairway.

A similar conclusion was reached by the Eighth Circuit in *United States v. Mendoza*, 281 F.3d 712, 715-16 (8th Cir. 2002). Mendoza's building was almost identical to the building in this case: a duplex with upper and lower units, an unlocked door on the front of the building, and two outside mailboxes. *See id.* at 714. Because the outside door was unlocked and there were mailboxes for two different apartments, the court held that there was no signal to officers that knocking was necessary. *Id.* at 715-16. Mendoza had done nothing that would lead officers to believe that he had a protected interest in the hallway, and thus he had no reasonable expectation of privacy. *Id.* *Mendoza* is consistent with the decisions of other circuits, which generally hold that tenants do not

---

[1] At oral argument, the government argued that Dillard had waived the common area issue by not addressing it in his motion to suppress or appellate brief. But because Dillard argues generally that "[t]he entry upon the home at 12815 Iroquois was a clear violation of the constitutional rights of [Dillard]," we find that Dillard has not waived this issue. Although Dillard's argument is cursory, the government has had a full and fair opportunity to consider and address the issue, evidenced by its common area arguments both in its supplemental response to Dillard's motion to suppress and in its appellate brief.

have a reasonable expectation of privacy in the common areas of their apartment building. *See, e.g.*, *United States v. Miravalles*, 280 F.3d 1328, 1331-33 (11th Cir. 2002) (unlocked hallway of multi-unit apartment building); *United States v. Brown*, 169 F.3d 89, 92 (1st Cir. 1999) (unlocked lobby of multi-unit apartment building); *Acosta v. United States*, 965 F.2d 1248, 1251-54 (3d Cir. 1992) (unlocked hallway of multi-unit apartment building); *United States v. Concepcion*, 942 F.2d 1170, 1172-73 (7th Cir. 1991) (locked hallway of six-unit dwelling); *United States v. Holland*, 755 F.2d 253, 255-56 (2d Cir. 1985) (locked hallway of duplex).

We recognize that many of these cases from our sister circuits explicitly reject holdings—never overruled in this circuit—recognizing a reasonable expectation of privacy in common areas of multi-occupancy buildings. *Compare United States v. Carriger*, 541 F.2d 545, 552 (6th Cir. 1976), *and United States v. King*, 227 F.3d at 750, *with United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993) ("[W]e join the First, Second, and Eighth Circuits which have rejected [*Carriger's*] rationale and held an apartment dweller has no reasonable expectation of privacy in the common areas of the building whether the officer trespasses or not."), *and Miravalles*, 280 F.3d at 1332 ("The only circuit that has recognized a reasonable expectation of privacy in the common areas of an apartment building, at least when the door is locked, is the Sixth Circuit."). While *Carriger* and *King* remain controlling in this circuit, we are not required to step further outside the mainstream by extending their holdings to cases that are reasonably distinguishable.

*Carriger* is distinguishable because in that case the defendant's building was locked. We held that, when "an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed." 541 F.2d 545, 552 (6th Cir. 1976). Tenants have a reasonable expectation of privacy in locked common areas because a "tenant expects other tenants and invited guests to enter in the common areas of the building, but he does not expect trespassers." *Id.* at 551; *see also United States v. Heath*, 259 F.3d 522, 534 (6th Cir. 2001) (holding that police violated the defendant's expectation of privacy when they used the defendant's key, without his permission, to enter the building). Obviously the expectation of privacy in a locked building is greater than in an unlocked building.

*United States v. King* is also distinguishable. In *King*, we decided whether a tenant had a reasonable expectation of privacy in the unlocked common basement of a duplex. 227 F.3d at 750. King's basement was open to the residents of both apartments. *Id.* at 748. The basement could be reached in two ways, either through a door on the side of the house or through a common hallway in the interior of the house. *Id.* The doors to the basement were unlocked. *Id.* Because a duplex is more akin to a single-family home than a large apartment building, we held that King had a reasonable expectation of privacy in the basement:

> [T]he nature of the living arrangements of a duplex, as opposed to a multi-unit apartment building, affords the tenant of the duplex a greater expectation of privacy in areas the tenant of the multi-unit apartment building would not enjoy, because in the case of a duplex, access to such areas is limited to the duplex's tenants and landlord.

*Id.* at 750. With duplexes, there are fewer tenants, visitors, agents of the landlord, salespeople, and delivery people who have regular access to the common areas, and thus duplex tenants have a greater expectation of privacy than tenants of a large multi-unit apartment building.

This case, however, is different from *King* because the common area at issue is not a basement but rather a hallway and stairway. Unlike a basement, a duplex common hallway and stairway are used by people other than the tenants. There may have been fewer people regularly entering Dillard's duplex than in a multi-unit building, but, because the doors were unlocked, those

people would still use the hallway and stairway to gain access to Dillard's apartment.[2]  It is much less likely that those people would have any reason to enter a duplex basement.  For these reasons, Dillard did not have an objectively reasonable expectation of privacy in the unlocked and open common hallway and stairway of his duplex.  Thus, the district court properly ruled that the officers did not violate the Fourth Amendment.[3]

## C.    *Booker* **Claim**

Although the district court's sentence was erroneous in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), resentencing is not warranted.  Dillard waived his right to appeal his sentence in the plea agreement.  In addition, the district court did not violate the Sixth Amendment when it issued its sentence because Dillard stipulated to the amount of drugs.  We therefore affirm Dillard's sentence.

Dillard first challenges his sentence on the ground that "the 128 month sentence . . . did not comply with the U.S. Supreme Court's ruling in *Blakely* [*v. Washington*, 542 U.S. 296 (2004)] or *Apprendi* [*v. New Jersey*, 530 U.S. 466 (2000)] in that the issue of the amount of drugs was not presented to a jury or waived by [Dillard]."  This claim, however, is without merit for two reasons.  First, there is no Sixth Amendment violation when a district court bases a sentencing determination on facts admitted by the defendant.  *See Booker*, 543 U.S. at 244.  Here, Dillard stipulated in the plea agreement that police found 293 grams of cocaine base in his apartment and that the amount of cocaine base he conspired to distribute was at least 150 grams, but less than 500 grams.  Therefore, the district court did not violate the Sixth Amendment when it based its sentence on these facts.  Second, under the remedial holding of *Booker*, there is no Sixth Amendment violation if facts are determined by a judge pursuant to an advisory guideline sentencing scheme.  *See id.* at 233.

Dillard also argues that his case should be remanded for resentencing because the district court sentenced him by applying the Sentencing Guidelines as mandatory rather than advisory.  However, because Dillard waived his right to appeal his sentence, he cannot seek a remand under *Booker*.

In his plea agreement, Dillard expressly waived all of his appellate and habeas rights except the right to appeal the denial of his motion to suppress and the right to appeal his sentence if it was inconsistent with the terms of the plea agreement.  In *United States v. Bradley*, this court held that a voluntary waiver of appeal in a plea agreement precludes *Booker* review of the sentence.  400 F.3d 459, 465 (6th Cir. 2005).  While it is arguable that *Bradley* is distinguishable from this case because Dillard did not expressly agree to be sentenced under the Guidelines, *see Bradley*, 400 F.3d at 461, that fact is of questionable relevance to the *Bradley* holding.  As we explained in *United States v. Amiker*, 414 F.3d 606, 607 (6th Cir. 2005), the language in *Bradley* concerning Bradley's explicit agreement to be sentenced under the Guidelines "is best interpreted as merely additional rationale serving only to buttress the court's decision that the defendant had waived his right to appeal."  Because Dillard waived his right to appeal his sentence, *Bradley* controls and Dillard is not entitled to a *Booker* remand.

---

[2]James testified that the front door was always locked, but because the front door was open on the day in question, we assume that it was always open for Fourth Amendment purposes.  *See Miravalles*, 280 F.3d at 1332-33.  It would be unreasonable to charge police officers with a duty to know whether an apartment building was maintained differently on previous days.

[3]Dillard also appears to argue that the officers violated the Fourth Amendment merely by driving to his duplex, but he offers no support for the proposition that police officers need probable cause to drive on a public street.

**IV.**

For the foregoing reasons, the judgment of the district court is affirmed.