GRIFFIN, Circuit Judge.
Defendant-appellant Gary Davenport pled guilty to three offenses: possession of five grams or more of Schedule II controlled substance methamphetamine (“meth”), in violation of 21 U.S.C. § 841(a)(1); attempted manufacture of a detectable amount of meth, in violation of *375 21 U.S.C. § 846; and failure to appear for trial while on bond, in violation of 18 U.S.C. § 3146. The plea agreement recommended holding Davenport responsible for only 6.9 grams of meth and calculated the offense level as 25; accordingly, the agreement contemplated a sentence within the corresponding suggested Guidelines range of 70-87 months imprisonment. By contrast, the probation office’s presentence report (“PSR”) recommended holding Davenport responsible for 1,365.1 grams of meth and for the possession of a firearm during a drug offense, and calculated the offense level as 37. Accordingly, the PSR urged a sentence within the corresponding suggested Guidelines range of 262-327 months’ imprisonment. Both Davenport and the prosecution filed objections to the PSR, but the probation office rejected the objections.
Davenport does not dispute the government’s statement that, at the plea colloquy, the district court advised Davenport, and he acknowledged, that the agreement did not bind the court, that the court had concerns about the agreement’s Guidelines calculations, and that the court could impose a sentence much higher than that recommended by the agreement.
After a hearing, the district court adopted the PSR’s determination of the meth weight attributable to Davenport and its finding that he possessed a handgun during a drug offense. The district court sentenced Davenport to concurrent sentences of 130 months each on the two meth convictions, and a consecutive 30 months on the failure to appear for trial, for a total of 160 months.
Upon timely appeal, Davenport asserts two assignments of sentencing error. First, Davenport contends that the district court erred in attributing 1,365.1 grams of meth to him because there was insufficient evidence to establish that he participated in the theft or concealment of that quantity of meth. Second, Davenport contends that the district court erred in adding two offense levels under U.S.S.G. § 2Dl.l(b)(l) because the evidence did not support a finding that he possessed a firearm during the meth offenses. Following our review of the record, and applying our standard of review, we hold that the district court did not commit clear error in its determination of drug quantity. Because we also conclude that the district court did not clearly err in finding that Davenport possessed a firearm during the commission of the meth offenses, we affirm defendant’s sentence.
I.
The district court had jurisdiction under 18 U.S.C. § 3231, which provides that “[t]he district courts of the United States shall have original jurisdiction ... of all [actions charging] offenses against the laws of the United States.” We have jurisdiction under 28 U.S.C. § 1291.
II.
A district court’s calculation of the amount of drugs for which a defendant is accountable is reviewed only for clear error. United States v. Sandridge, 385 F.3d 1032, 1037 (6th Cir.2004), cert. denied, 543 U.S. 1129, 125 S.Ct. 1099, 160 L.Ed.2d 1084 (2005). Its finding that a defendant possessed a firearm during a drug offense is likewise reviewed only for clear error. United States v. Davidson, 409 F.3d 304, 310 (6th Cir.2005) (citing United States v. Solorio, 337 F.3d 580 (6th Cir.2003)).
III.
Davenport dialed 9-1-1 and told the police that his “friends had stolen ten pounds of methamphetamine” and that the meth was in a camper where his friends were staying, along with two guns. The police *376 searched the camper, where codefendant Roxanne Abner and codefendant Wilson were present, and found 1,179 grams of 37%-pure meth,[1] i.e., the equivalent of 463.2 grams of actual 100% meth, in a nylon bag. The police also found 19.6 grams of 36-37%-pure meth, i.e. the equivalent of 7 grams of actual 100% meth, in a shaving kit. The police search of the camper also uncovered a shotgun, which Wilson said belonged to Davenport. Davenport denied owning the shotgun but acknowledged knowing about a handgun in Wilson’s truck. Wilson led the police to another six pounds of meth; to be precise, 2,561 grams of 36%-pure meth, the equivalent of 921.9 grams of actual 100% meth.
Drug Task Force Officer Harris testified that, when he responded to the 911 call, Davenport told him that “the Mexican Mafia was in the area, he feared for his life ... and there was a large quantity of methamphetamine ... and some firearms” in his friend’s camper. According to Officer Harris, the police found a handgun in a parked truck and a shotgun in a camper, which Wilson said belonged to Davenport; Officer Harris also recalled that Davenport appeared to be afraid.
After Davenport’s arrest, he admitted that he had traveled with Wilson in a trailer to steal meth out of a parked truck, and that Wilson had stolen the meth from the truck while he (Davenport) waited in Wilson’s truck. (At a later change-of-plea hearing, Wilson testified that he had remained in the vehicle while Davenport got out and stole the meth.)
At sentencing, codefendant Abner testified that she had seen Davenport in possession “the whole time” of the handgun found in codefendant Wilson’s truck. Abner had seen the handgun in Davenport’s pants shortly before his arrest, and she said that Davenport had been “so nervous” that she had been “worried that he was going to shoot someone.” Abner further testified that Davenport and Wilson told her that the two of them had stolen the meth.
Also at sentencing, codefendant Wilson testified that Abner told him where the meth was, whereupon he and Davenport “went and stole it.” Consistent with Davenport’s admission to the police, Wilson testified that he had removed the meth from the truck while Davenport waited nearby in Wilson’s truck. According to Wilson, Davenport “had the pistol.”
The district court also heard from United States Drug Enforcement Administration (“DEA”) Special Agent David Gray, who was present when Davenport and his codefendants were interviewed after their arrest. Agent Gray testified that Wilson said that he (Wilson) and Davenport stole the meth, specifically, that Wilson “actually broke into the truck as he [Davenport] stayed in the — their truck.”
Based on this testimony and the information in the PSR, the district court reasoned that the purity of the meth — about 37% pure for each batch of meth found at the campground — indicated that all the meth came from the same source.
The district court further found that the guns recovered by the police were connect *377 ed to the meth offense and were present for defendants’ protection. Relying on what it called the “credible” testimony of codefendant Abner that Davenport was so nervous that she was afraid he might shoot someone, the district court found that Davenport possessed the handgun during the meth offense.
TV.
At sentencing, it was the prosecution’s burden to prove the amount of meth attributable to Davenport by a preponderance of the evidence. United States v. Swanberg, 370 F.3d 622, 624-25 (6th Cir.2004) (citing United States v. Hernandez, 227 F.3d 686, 697 (6th Cir.2000)).
In determining whether the district court clearly erred in calculating the quantity of meth for which Davenport is accountable, “a key issue is the extent to which the [district] court identified the evidence on which it relied in making that calculation.” United States v. Henley, 360 F.3d 509, 515 (6th Cir.2004). Here, the district court stated that it credited the testimony of DEA Agent David Gray in finding that Davenport admitted (to Agents Johnson and Gray) that he was in the truck and helped Wilson steal the meth (about ten pounds);[2] thus, the district court explained, it found that Davenport was responsible for all of the pounds of meth recovered, rather than merely the 6.9 grams suggested by the parties in the plea agreement.
In addition, the district court’s finding necessarily shows that it implicitly credited the testimony of codefendant Abner that Davenport helped Wilson steal the meth,[3] and the testimony of Wilson that Davenport helped him steal the meth.
By crediting those persons’ testimony and admissions, the district court necessarily implicitly rejected Agent Johnson’s arguably conflicting testimony. Cfi United States v. Graham, 317 F.3d 262, 271 (D.C.Cir.2003) (‘With respect to the contrary testimony regarding the availability of cocaine base in the District during the summer of 1999, the district court referred [to] Andrews’ testimony in making its ruling, implicitly indicating that it was crediting Andrews’ testimony.”); United States v. Huskey, 137 F.3d 283, 291 (5th Cir.1998) (“In attributing to Huskey the entire amount of the 1992-1995 Kansas City shipments [of marijuana], the district court credited Cornelius’s, and implicitly Barnes’s, testimony that ... Barnes continued to take deliveries for Huskey.”).[4]
It is of no avail to Davenport that the district court did not expressly state that it *378 discounted Agent Johnson’s testimony regarding Davenport’s post-arrest statements about his connection to the meth. In this regard, we agree with the following reasoning of the Fifth Circuit:
When ... a trial court fails to render express findings on credibility but makes a ruling that depends upon an implicit determination that credits one witness’s testimony as being truthful, or implicitly discredits another’s, such determinations are entitled to the same presumption of correctness that they would have been accorded had they been made explicitly.
Self v. Collins, 973 F.2d 1198, 1214 (5th Cir.1992) (quoting Lavernia v. Lynaugh, 845 F.2d 493, 500 (5th Cir.1988) (citing Marshall v. Lonberger, 459 U.S. 422, 433-34, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983))).
On balance, it was not clear error for the district court to conclude that Wilson did not steal any of the meth without Davenport’s assistance. On Davenport’s side of the ledger, Agent Johnson’s report did quote Davenport as stating that “Wilson had told [Davenport] that Shawn Noe and Mike Cain assisted him,” i.e. Wilson, “in stealing the methamphetamines from Walters.” However, so far as the record reflects, Davenport never told his codefendants that Wilson stole any of the meth without his assistance, and neither Abner nor Wilson claimed that Wilson stole any of the meth without Davenport’s assistance. Nor does the rest of the record dictate the conclusion that any of the meth came from a source other than the truck that Davenport and Wilson admittedly robbed together.
On the contrary, the fact that the several amounts of meth were of the same purity constituted circumstantial evidence from which the district court could reasonably infer that all the meth came from the same source — again, the truck from which Davenport and Wilson admittedly stole the meth together. See United States v. Makki, 129 FedAppx. 185, 188 (6th Cir.2005) (affirming distribution conspiracy charges and noting that “[t]he heroin in these rugs was of the same type and purity as that found at Boudreau’s Collingwood residence.”); United States v. Hinton, No. 99-1193, 229 F.3d 1154, 2000 WL 1234348, at *1 (6th Cir. Aug. 24, 2000) (noting that the jury was not persuaded by defendant’s claim that he was not connected with crack cocaine found in car where, inter alia, “[c]hemical analysis of the crack recovered from the junkyard and from the car trunk revealed that the two samples were of identical purity and composition and appeared ‘to be the same’ ”).[5]
Davenport complains that,
[i]n crediting agent Gray’s testimony, the District Court ignored the exactly opposite testimony of DEA task force officer Rick Johnson who after all was the agent who conducted the interview [of the defendants], took the notes and prepared the DEA report summarizing the interview. Not only did officer Johnson have no recollection that Davenport made any statement implicating himself in the theft of the methamphetamine, he further testified consistent *379 with his report that he recalled Davenport stated [that] Wilson told him that Wilson, aided by Noe and Cain, stole the methamphetamine. [In contrast,] Agent Gray does not recall Davenport making this statement impheating Noe and Cain.
Davenport also complains that “[o]ddly, the District Court discounted Abner’s testimony on this point [that she had no personal knowledge of who stole the meth] but credited her testimony that Davenport carried a pistol at the campground.... ” In lodging these criticisms, however, Davenport does nothing to question the competency, relevancy, or admissibility of the evidence tending to inculpate him, i.e., the testimony and out-of-court statements of codefendants Abner and Wilson, DEA Agent Gray, and Davenport himself.
Nor is Davenport actually arguing, as his brief imprecisely states, that the district court “ignored” Agent Johnson’s testimony that Davenport implicated only Wilson, Noe, and Cain, rather than himself, in the theft of the meth. Rather, Davenport merely disagrees with the district court’s discretionary decision to credit the testimony of Abner, Wilson, and Agent Gray, rather than Agent Johnson’s contrary report and recollection.
On Davenport’s behalf, we note that Agent Gray admitted that “I don’t remember word-for-word everything [Davenport] said,” and that Gray did not conduct the interview or take notes. In light of Agent Gray’s candor on this score, the dissent finds it suspicious that Agent Gray nonetheless insisted that he was “100 percent certain that [Davenport] said to [me] that day, that he was there when the meth was stolen.” The dissent contends that the credibility of Gray’s recollection is further undermined because, as Johnson himself observed, Davenport’s admission ordinarily “[w]ould be something that you guys in the DEA would try to include in your report.” Here we note, like the dissent, that Johnson’s recollection is consistent with his report, i.e., Johnson did not recall “Davenport ever acknowledging that he was present with Chris Wilson during the theft of the methamphetamine.”
A district court, however, is “in the best position to judge credibility,” United States v. Dillard, 438 F.3d 675, 681 (6th Cir.) (citation omitted), cert. denied, — U.S.-, 127 S.Ct. 291, 166 L.Ed.2d 222 (2006), and this court accords “great deference” to such credibility determinations. Id. (citation omitted).
This is because “only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding of and belief in what is said.” Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). As the Supreme Court has stated,
Face to face with living witnesses the original trier of the facts holds a position of advantage from which appellate judges are excluded. In doubtful cases the exercise of his power of observation often proves the most accurate method of ascertaining the truth.... How can we say the judge is wrong? We never saw the witnesses____To the sophistica-
tion and sagacity of the trial judge the law confides the duty of appraisal.
Marshall v. Lonberger, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (citation omitted).
This is not to say that our deference to a district court’s credibility assessments is unlimited. In determining whether a credibility assessment was clearly erroneous, “we have ... looked at whether testimony is inconsistent or otherwise contradicts the [non-testimonial] record.” Dillard, 438 F.3d at 681 (citing United States v. Foster, 376 F.3d 577, 583-84 (6th *380 Cir.2004)). In this case, the district court’s decision to credit the other witnesses over Agent Johnson is not clearly erroneous because the other witnesses’ testimony about Davenport’s responsibility for the meth does not contradict the non-testimonial record. The district court was free to credit Agent Gray’s recollection of Davenport’s admission because that recollection was not contradicted by Agent Johnson’s report. Agent Gray testified that Davenport admitted to stealing the meth, while Agent Johnson’s report simply does not address that issue one way or the other. The absence of a notation of Davenport’s confession in Johnson’s report does not “contradict” Agent Gray’s recollection of Davenport’s confession.
Ultimately, Davenport offers no evidence beyond Agent Johnson’s testimony to support his claim that it was not he, but Cain and Noe, who helped Wilson steal the meth. Cf. Dillard, 438 F.3d at 681 (“[T]he district court’s adoption of the police version [that Holton voluntarily let them in the apartment] is not clearly erroneous because the officers’ testimony does not contradict the record. Dillard offers no evidence beyond Holton’s testimony to support his version of the search.”).
It was not unreasonable for the district judge to conclude that, while Agent Gray didn’t remember every word of Davenport’s interview, he was telling the truth when he recalled hearing Davenport confess. Just as Agent Gray’s recollection could have been less than perfect, Agent Johnson’s report could have been less than perfect, as well — for example, the district court reasonably could suspect that Johnson’s recollection was influenced by his knowledge of what his report claimed. Charitably, Agent Johnson might have honestly come to believe that his recollection was correct because it matched his interview report.
In summary, this record allowed the district court to credit Agent Johnson’s testimony over that of the other witnesses, but it did not compel the court to do so. Likewise, the record allowed the distinct court to discredit Abner’s testimony that she had no personal knowledge of who stole the meth, but it did not compel the court to do so. “Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be clearly erroneous.” Dillard, 438 F.3d at 681 (quoting Anderson, 470 U.S. at 574, 105 S.Ct. 1504). Davenport provides no basis for us to disturb the finding that he was responsible for all the meth, rather than the 6.9 grams suggested by the plea agreement.
V.
Enhancement analysis under U.S.S.G. § 2Dl.l(b)(l) has two parts. First, it was the prosecution’s burden to prove by a preponderance of the evidence that Davenport possessed a firearm during a drug offense, in this case one of the two charged meth offenses. Davidson, 409 F.3d at 312 (citation omitted). Possession can be actual or constructive. Id. To establish constructive possession, the prosecution must show that Davenport had “ownership, dominion, or control over the firearm or dominion over the premises where the firearm [was] located.” Id. (internal quotation marks and brackets omitted).
If the prosecution establishes by a preponderance of the evidence that Davenport actually or constructively possessed a firearm, the burden shifts to Davenport to demonstrate that “it was clearly improbable that the weapon was connected to the [meth] offense.” Id.; United States v. Johnson, 344 F.3d 562, 565 (6th Cir.2003) (citing U.S.S.G. § 2Dl.l(b)(l), cmt. 3). *381 “ ‘Only if the defendant can make this showing does the enhancement not apply.’ ” Davidson, 409 F.3d at 312 (quoting Solorio, 337 F.3d at 599). This court has “emphasize[d] that the ‘clearly improbable’ standard is a difficult burden to meet----” Johnson, 344 F.3d at 567; see also United States v. Bolka, 355 F.3d 909, 914 (6th Cir.2004) (“The ‘clearly improbable’ standard is a higher quantum of proof than that of the ‘preponderance of evidence’ standard.”).
Adequate evidence led the district court to its finding that Davenport possessed the firearm during the meth offenses. First, Drug Task Force Officer William Harris testified that when he responded to the 911 call, Davenport told him that “the Mexican Mafia was in the area, he feared for his life, ... and there was a large quantity of methamphetamine ... and some firearms” in his friend’s camper. Davenport himself states, “The evidence was uncontroverted that Davenport was very fearful for his life while at the campground.” Absent evidence to the contrary, it is generally logical to believe that someone who fears for his life might possess a firearm to protect himself against the source of the fear — in this case, meth dealers allegedly affiliated with Mexican organized crime.[6]
More specifically, Officer Harris testified that the police found a handgun in a parked truck and a shotgun in a camper, which Wilson said belonged to Davenport; Harris also recalled that Davenport appeared to be afraid. Most directly, codefendant Abner testified that she saw Davenport in possession “the whole time” of the handgun found in Wilson’s truck. Abner testified that she had seen the handgun in Davenport’s pants shortly before his arrest, and she said that Davenport had been “so nervous” that she had been “worried that he was going to shoot someone.”
As with the drug quantity issue, Davenport rests his criticism of the district court’s firearm possession finding on inconsistencies in the witnesses’ testimony. For example, Davenport complains that Wilson (1) told Officer Harris that Davenport possessed the shotgun, but made no mention of the handgun at that time, but then (2) testified at sentencing that Davenport possessed the handgun and he (Wilson) possessed the shotgun. “On cross-examination Wilson was not able to explain the difference in his two statements.” This amounts merely to an attack on the district court’s decision to credit Wilson’s testimony, rather than his earlier state *382 ment to Officer Harris, and Davenport does nothing to convince us that that decision was clear error.
Davenport also complains that his codefendants’ testimony that he possessed the handgun was “largely self-serving.” This, too, boils down to an attack on the district court’s decision to credit the codefendants’ testimony that Davenport possessed the handgun. The district court was free to conclude that the codefendants’ claim about who possessed the handgun was not credible because it was self-serving, i.e., designed to forestall the conclusion that it was one of the codefendants who possessed that weapon instead. But the district court was not compelled to do so. “There is no per se rule against ‘self-serving’ testimony.” Comeau v. Rupp, 810 F.Supp. 1127, 1144 n. 8 (D.Kan.1992).
Davenport also reasons, “when officer Harris and the other police officers arrived Davenport had no weapon in his [actual] possession. One would think if Davenport had access to a weapon he would have had it with him at that time for his own protection.” This argument is unavailing. The district court could have adopted that fine of reasoning, but nothing in the record or the law compelled it to do so. The district court could reasonably find that Davenport constructively possessed the handgun during the meth offense even if it believed that Davenport did not have the handgun on his person when the police arrived at the campground.
Thus, the district court did not clearly err in finding that Davenport possessed the handgun during the meth offenses. The burden then shifted to Davenport to show that it was “clearly improbable” that the firearm was related to the meth offenses. Davidson, 409 F.3d at 312. Davenport’s appellate brief does not attempt to make this showing, and the record does not suggest that it was clearly improbable that the handgun was related to the meth offenses. Cf. Davidson, 409 F.3d at 313 (“Given the large presence of large quantities of drugs ..., we cannot conclude that it was error for the district court to conclude that it was not ‘clearly improbable’ that the gun was connected to Mrs. Davidson’s drug possession offense.”). Therefore, the district court did not clearly err in finding that Davenport possessed a firearm during the meth offenses.
Affirmed.

. This court has recognized the practice of "cutting” illegal drugs: " 'Inactive ingredients are combined with pure [forms of the illegal drug], and the mixture is then sold to consumers as a heavily diluted form of the drug.' By diluting the drug with some other substance, the distributor is increasing the amount of the drug he has available to sell to consumers....” United. States v. Jennings, 945 F.2d 129, 137 (6th Cir.1991) (quoting Chapman v. United States, 500 U.S. 453, 460, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991)), clarified on other grounds, 966 F.2d 184 (6th Cir.1992).

. Agent Gray’s recollection of Davenport’s alleged admission is not a separate piece of evidence from that admission.

. The dissent correctly notes that Abner gave conflicting testimony as to whether she knew who stole the meth. Although Abner stated that Davenport confessed his involvement in the theft to her, Abner also stated several times at the sentencing hearing that she did not have personal knowledge of who was involved in the theft.
But we cannot agree with the dissent’s assertion that Abner’s testimony must therefore be taken as tipping in Davenport's favor. Abner was necessarily lying either when she testified that Davenport told her he stole the meth or when she testified that she did not know who stole the meth. Based on its firsthand observation of Abner while she testified, the district court credited the former testimony by Abner, and there was nothing unreasonable about doing so.

. Cf. United States v. Welch, 97 F.3d 142, 154 n. 8 (6th Cir.1996) (”[I]n crediting the version of events as described in the presentence report and as the District Court believed Wilson testified, it implicitly made a credibility determination with regard to Baldwin who testified consistently as to this version of the same events.”) (emphasis added).

. Accord United States v. Tapia-Torres, Nos. 94-10134 & 94-10152, 52 F.3d 335, 1995 WL 218511, at *9 (9th Cir. Apr. 13, 1995) ("The methamphetamine in the June 17 half-pound delivery had the same purity level as that of methamphetamine seized from the Selma lab, which led to the inference that it had been manufactured there.”); United States v. Fierro, 38 F.3d 761, 768-69 (5th Cir.1994) (“The following evidence ... supports the convictions of all defendants on all counts: * * * The bag, which had been seen previously in Martinez’s possession, contained four kilograms of cocaine that was of similar purity to the cocaine seized from the stash house.”).

. Independent of Davenport’s fear of the people from whom the meth was stolen, this court has recognized that possession of illegal drugs itself can provide an incentive to possess a firearm — both because a large quantity of illegal drugs can be extremely valuable, and because trafficking in illegal drugs often invites and is characterized by violence. As this court stated in United States v. Ricks, No. 96-6544, 165 F.3d 29, 1998 WL 639166, at *3-4 (6th Cir. Sept. 10, 1998):
[T]he district court concluded that Petitioner had failed to show that it was "clearly improbable” that the two shotguns were connected to the drug-trafficking offense. Specifically, the court found that the shotguns were located in close proximity to the cocaine and were readily accessible.... Thus, the court concluded, the evidence “supports th[e] finding that the shotguns were on the premises for the purpose of protecting the cocaine, the cash proceeds from the sale of cocaine, and to protect Ricks personally during the course of his cocaine transactions.” * * * We conclude that the district court properly applied the § 2D1.1(b)(1) enhancement.
See also generally United States v. SagasteCruz, 187 Fed.Appx. 804, 809 (10th Cir.2006) (“[I]t is quite common for drug dealers to carry weapons to protect their merchandise, their cash receipts, and to intimidate potential purchasers.”) (citing United States v. Becker, 230 F.3d 1224, 1231 (10th Cir.2000)).