Eric QUINTANA, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

and

Brian Bottom; and Melissa Bottom, Appellants,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2006–SC–000629–DG, 2006–SC–000823–DG.

Supreme Court of Kentucky.

Oct. 23, 2008.

Rehearing Denied March 19, 2009.

John David Seay, Bardstown, KY, Jeremy Dwight Chesser, Bardstown, KY, Counsel for Appellant, Eric Quintana.

Jeffrey Hall Hoover, Hoover law office, Jamestown, KY, Counsel for Appellants, Brian and Melissa Bottom.

Jack Conway, Attorney General, Terry Lane Geoghegan, Commonwealth Attorney, Bardstown, KY, Bryan Darwin Morrow, Office of the Attorney General, Michael Louis Harned, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice NOBLE.

These two cases were argued before the Court on the same day, and involve the propriety and limits of the police procedure commonly called the "knock and talk," where officers approach a residence, knock on the door, and talk to a person who answers, ostensibly to obtain general information that could assist in an ongoing investigation or matter of public interest. The Appellants in both cases were convicted of drug offenses based on evidence obtained from use of the knock and talk procedure, and the Court of Appeals affirmed their convictions. This Court granted discretionary review to address the parameters of that procedure. We hold that the knock and talk procedure is a proper police procedure and may be used to investigate the resident of the property, provided the officer goes only where he has a legal right to be.

## I. Background

### A. Eric Quintana

The Greater Hardin County Narcotics Task Force was informed by a state trooper that he had received an anonymous tip from an informant who claimed his son had purchased marijuana from a man named "Eric." This did not afford sufficient evidence to obtain a search warrant, but a local officer, Detective Knochel, decided to conduct a knock and talk at Appellant Eric Quintana's residence based on the call. Detective Knochel, a state trooper, and a Task Force officer arrived at the residence and knocked on the front door, which was located on a converted garage. No one answered the door, so the state trooper went to the back yard, allegedly looking for a back door, but walked some thirty to forty feet across the back of the house to a window at the far end of the house where an air conditioner unit was located. The trooper claimed that he could smell marijuana emanating from the air conditioner, and on this basis a warrant was obtained. In the search of the residence, the officers found 99 small marijuana cuttings that had been started in a growing medium, five small developed plants, one large plant, and cultivation materials. Appellant Quintana moved the trial court to suppress all evidence obtained as a result of the search because of inappropriate use of the knock and talk procedure. The trial court denied the motion, and Quintana subsequently entered an *Alford* plea to charges of cultivating marijuana and possession of drug paraphernalia, and was sentenced to one year in prison.

### B. Brian and Melissa Bottom

A person matching the description of Appellant Melissa Bottom bought two sixteen-ounce bottles of iodine from a local company in Adair County. The store manager noted the type of car and its

license plate number, which turned out to be registered to Brian or Melissa Bottom. Since iodine is a key ingredient in the manufacture of methamphetamine and the person appeared to be "strung out," the store manager reported the purchase, along with a description of the buyer, her car and her license plate number, to the Adair County sheriff, who turned the information over to law enforcement officials in Russell County, where the Bottoms lived. State police detective Scott Hammond and officers from the Jamestown and Russell Springs police departments went to Brian Bottoms's residence in Jamestown (Brian and Melissa were divorced). No one was home, and the car described in connection with the iodine purchase was not there. As the officers were leaving they passed a vehicle meeting the description of the car going toward Brian's house. The officers turned back and observed the car at Brian's residence. The license plate number matched that on the vehicle the store manager claimed the iodine buyer had been driving.

Some two and a half hours later, the officers went back to Brian's residence to knock and talk about the iodine purchase. Both Bottoms answered the door, and Melissa had iodine stains on her hands. The officers could smell chemicals from the porch. When the officers asked Melissa about the purchase of the iodine, she said she got it for her grandfather. When asked for his address, she changed her story and asked not to speak with the officers any further. The officers then asked about the iodine stains, and Melissa put her hands under her arms and shook her head. The officers then asked Brian if anything illegal was going on, to which he replied no. They requested consent to search the house, which Brian denied.

The officers then left and obtained a warrant based on the chemical smells and their observations at the house. They returned and entered the residence, and found a methamphetamine manufacturing operation, marijuana, and drug paraphernalia. Appellants Brian and Melissa moved the trial court to suppress this evidence based on the initial warrantless entry on the property and improper use of the knock and talk procedure. The trial court denied the motion. Appellants Brian and Melissa Bottom entered conditional guilty pleas to manufacturing methamphetamine, and Brian pleaded guilty to two additional counts of tampering with a witness. Melissa was sentenced to ten years, Brian to twelve.

## II. Analysis

### A. The Knock and Talk Procedure

The knock and talk procedure involves law enforcement officers approaching a home for the purpose of obtaining information about a crime that has been committed, a pending investigation, or matters of public welfare. This Court has not previously decided the propriety of the knock and talk procedure, though the Court of Appeals has approved it. *See, e.g., Perkins v. Commonwealth,* 237 S.W.3d 215, 219 (Ky.App.2007) ("We agree that there is nothing inherently unconstitutional or even inappropriate about the use of the knock and talk technique as an investigatory tool."). Various federal courts, including the Sixth Circuit, have also ruled that the technique does not automatically violate the Fourth Amendment. *See United States v. Thomas,* 430 F.3d 274, 277 (6th Cir.2005) (approving knock and talks and citing similar approval by the Fifth, Seventh, and Ninth Circuits). While the decisions of these courts do not control a decision by this Court, they are persuasive authority. Nevertheless, given the importance of the rights involved, an indepen-

dent analysis is necessary to determine whether this Court is in agreement.

The knock and talk procedure is a helpful and commonly used police tool, often applied in situations as mundane as looking for a lost pet or to ask if the homeowner has seen a suspicious person in the neighborhood.[1] In general, an officer knocking on the door to ask for citizen assistance is appreciated and the citizens are cooperative. However, that is not always the case, as some citizens desire privacy and to be left alone to the enjoyment of their home. Controversy may arise when the officer is not looking for assistance from the resident, but rather is using the procedure to look for evidence of wrongdoing by the resident, and approaches the home to ask for consent to search or to aid in spotting evidence in plain view or plain smell.

Since officers must walk onto the property and up to the house itself to reach the door to knock, as opposed to looking from the street or a public sidewalk, the rights one has to the curtilage of the house are relevant. Curiously, cases addressing the knock and talk procedure fail to make this connection. E.g., Hardesty v. Hamburg Twp., 461 F.3d 646 (6th Cir.2006) (addressing separately curtilage and knock and talk issues). The concept of curtilage began in common law, extending the same protection afforded the inside of one's home to the area immediately surrounding the dwelling. United States v. Dunn, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). In Oliver v. United States, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984), the United States Supreme Court recognized that the Fourth Amendment protects the curtilage of a house, and the area covered extends to that which an individual may reasonably expect to be treated as the home itself. In Dunn, the Supreme Court established four analytical, non-exclusive factors which should be applied to solve curtilage questions: the proximity of the area to the home, whether the area is included in an enclosure with the home, how the area is used, and the steps the resident has taken to prevent observation from the people passing by. Because there is no expectation of privacy for anything that can be observed from outside the curtilage, either by sight or other senses, the focus of a knock and talk analysis must be on the right of access to private property within the curtilage.

The fact that the curtilage as well as the home itself is entitled to Fourth Amendment protection and an expectation of privacy is premised on strong concepts of intimacy, autonomy, and sanctuary that develop around home and family life, and the fact that many related activities will occur outside the house. Dow Chemical Co. v. United States, 749 F.2d 307 (6th Cir.1984). One's front door is the portal to the enjoyment of these concepts, and is a part of the house itself, thus the space immediately in front of it obviously falls within the definition of curtilage as the area immediately surrounding the house. However, whether Fourth Amendment protection extends to that area is evaluated under the test in Dunn.

■ Since knock and talks are typically conducted at the front door, the most important factor for Fourth Amendment analysis, given that the area in question is the main entrance to the home, is how the area is used. As the Supreme Court pointed out in Oliver, any expectation of

---

1. The knock and talk procedure must be distinguished from the "knock and announce" procedure, which occurs only after obtaining a warrant, and is specifically intended to avoid injury to the officers or residents and unnecessary damage to private property when officers are serving the warrant.

privacy, even in one's curtilage, must be *reasonable.* 466 U.S. at 180, 104 S.Ct. 1735 ("[C]ourts . . . have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private."). The *Oliver* Court, in finding that open fields were not part of the curtilage and were thus subject to search, determined that such areas were open to both the public and police officers, even where fences or "No Trespassing" signs were present, but pointed out the difference between open fields and the area immediately adjacent to one's home. *Id.* at 179, 104 S.Ct. 1735.

However, the main entrance to a home is so widely perceived by the public as the point of access for the public engaged in legitimate business, whether it is by pollsters, persons seeking assistance, postal carriers, delivery persons, or Girl Scouts selling cookies, that it amounts to common knowledge that the public may at least go up to a home's front door, if the way is not barred. While such members of the public are not guaranteed access to the inside of the house, they may certainly approach the entrance and attempt to speak with the residents. The homeowner's consent to approach that area which would otherwise be entitled to Fourth Amendment curtilage protection is assumed. Thus, certain areas such as driveways, walkways, or the front door and windows of a home frequently do not carry a reasonable expectation of privacy because they are open to plain view and are properly approachable by any member of the public, unless obvious steps are taken to bar the public from the door.

■ The answer in basic knock and talk cases then is clear: the officer who approaches the main entrance of a house has a right to be there, just as any member of the public might have. When a resident has no reasonable expectation to privacy if someone approaches his front door for a legitimate purpose, police officers may also so approach. As a leading treatise on the subject has noted, the basic rule is

> "that police with legitimate business may enter the areas of the curtilage which are impliedly open to use by the public," and in so doing they "are free to keep their eyes open and use their other senses." This means, therefore, that if police utilize "normal means of access to and egress from the house," for some legitimate purpose, such as to make inquiries of the occupant or to introduce an undercover agent into the activities occurring there, it is not a Fourth Amendment search for the police to see or hear or smell from that vantage point what is happening inside the dwelling.

1 Wayne R. LaFave, *Search and Seizure: Looking at or Listening at the Residence* § 2.3(c) (4th ed.2007). *quoted in Young v. City of Radcliff,* 561 F.Supp.2d 767, 786 (W.D.Ky.2008). Essentially, the approach to the main entrance of a residence is properly "invadable" curtilage, under *Dunn* and *Oliver* because it is an area that is open to the public.

■ The curtilage question, however, is not the only one relevant to the knock and talk procedure. The means employed by the police in the course of the knock and talk procedure to obtain consent or interaction with the resident can also give rise to a Fourth Amendment violation and must be evaluated separately. For example, this Court has previously held that use of a coercive ruse to obtain consent to enter a residence in the course of a knock and talk undermined the purposes inherent in requiring consent to search absent a warrant and violated the defendant's Fourth Amendment rights. *Krause v. Commonwealth,* 206 S.W.3d 922 (Ky.2006).

The Sixth Circuit has held that a knock and talk can lead to a violation of the Fourth Amendment when the "consensual encounter at the doorstep ... evolve[s] into a 'constructive entry' when the police, while not entering the house, deploy over-bearing tactics that essentially force the individual out of the home." *Thomas,* 430 F.3d at 277. Thus, it is clear that any interaction between the police and the resident of a house in the course of a knock and talk must be consensual.

The knock and talk issue becomes more complicated if an officer ventures farther than unbarred public access areas. Several federal circuit courts have held that a knock and talk may be extended to the back door of a home under certain circumstances, for example, when knocking at the front door is unsuccessful and there are indications that the resident is at home. *See Hardesty,* 461 F.3d at 654 (citing cases from Third, Fourth, Eighth, and Ninth Circuits). A decision of our Court of Appeals also indicates that the knock and talk procedure may extend until the officers succeed in contacting the resident of a house. *Cloar v. Commonwealth,* 679 S.W.2d 827, 831 (Ky.App.1984) ("We limit the permissible scope of this right, however, to driveways, access roads, and as much of the property's sidewalks, pathways, and other areas as are necessary to enable the officer to find and talk to the occupants of the residence."). Those decisions, however, are not binding on this Court, and in light of the preceding analysis, are not persuasive.

■■ Whether an officer is where he has a right to be when he does the knock and talk is defined by his limited purpose in going to the residence and the nature of the area he has invaded. There has been no finding of probable cause sufficient to grant a warrant, so the knock and talk is limited to only the areas which the public can reasonably expect to access. While there is a right of access for a legitimate purpose when the way is not barred, or when no reasonable person would believe that he or she could not enter, this right of access is limited. The resident's expectation of privacy continues to shield the curtilage where an outsider has no valid reason to go. Thus any part of the curtilage may be protected, including driveways, depending on the circumstances of each case. *United States v. Smith,* 783 F.2d 648 (6th Cir.1986). The back door of a home is not ordinarily understood to be publicly accessible, and thus could be subject to the curtilage rules where the front door would not be. However, it is also true that customary use of a door, such as a side or back door, as primary access which is known by the officer, could make that door "publicly accessible" in a given case. This highlights the importance of applying this analysis to the facts of each case.

■■ An officer's belief that someone is home and simply not answering the door does not change this analysis. The crux of the validity of the knock and talk procedure is that it is a consensual encounter in a place where the officer, like the public, has a right to be. Just as no resident is required to answer his door or respond to questions when the general public comes calling, so it is with a police officer, regardless of whether the failure to answer the door is intentional or the result of the resident's inability to hear the knock. Moreover, as any member of the public can be told and required to leave the premises, so can an officer. Unless an officer has probable cause to obtain a warrant or exigent circumstances arise, the intrusion can go no further than the approach to the obvious public entrance of the house. As the treatise cited above continues, "On the other hand, if the police stray from that path to other parts of the

curtilage in order to conduct the surveillance, then the use of natural sight or hearing to detect what is inside is a search within the meaning of the Fourth Amendment." 1 Wayne R. LaFave, *Search and Seizure: Looking at or Listening at the Residence* § 2.3(c) (4th ed.2007), *quoted in Young v. City of Radcliff,* 561 F.Supp.2d 767, 786 (W.D.Ky.2008).

Instead of falling directly under the knock and talk rule, as the Sixth Circuit has held, when an officer leaves the approach to the main entrance of a residence, a separate and distinct curtilage question arises. The trial court is tasked with determining separately whether the new area where the officer ventures is within the protected curtilage of the home. To determine this, the four-factor analysis of *Dunn* must be applied: proximity to the house, whether the area is enclosed with the house, how the area is being used, and what the resident has done to secure his privacy. If the area is determined to be within the protected curtilage, then the officer is not in a place where he has a right to be, and any evidence thus illegally seized must be suppressed. *United States v. Jenkins,* 124 F.3d 768 (6th Cir.1997).

### B. Application to the current cases

#### 1. Quintana

The "plain smell" that occurred at Appellant Quintana's residence, which led to a search of the house and discovery of the marijuana, occurred in his back yard. The officers approached the house by walking up a driveway, and first knocking on what appeared to be the front door in the garage addition. However, when no one answered the door, one officer walked the remaining length of the driveway and into the back yard to "look for a back door." Though he saw no back door, he walked thirty to forty feet across the back yard to a window air conditioning unit on the far end of the house where he then claimed to smell the marijuana. This identified smell led the judge to issue a search warrant for the house.

Applying the analysis from above, when the officer moved beyond the public entrance of the home, he went beyond the limits of a proper knock and talk. The question then is whether Appellant Quintana's curtilage rights were violated when the officer proceeded into his backyard.

A back yard is not normally an area that the general public would perceive as public access. While the back yard may not always enjoy the protection of the curtilage, it is a rare one that does not. *See Daughenbaugh v. City of Tiffin,* 150 F.3d 594, 601 (6th Cir.1998) ("The backyard and area immediately surrounding the home are really extensions of the dwelling itself. This is not true simply in a mechanical sense because the areas are geographically proximate. It is true because people have both actual and reasonable expectations that many of the private experiences of home life often occur outside the house."). Under the four-factor analysis of *Dunn,* the back yard in this case satisfies proximity since it was immediately in back of the house; while not completely enclosed, home living items were in the yard; and a concrete patio was in the yard behind the house, as was a large gas tank which shielded part of the patio from view. Perhaps most telling about Appellant's expectation of privacy is the presence of a dog kennel and what appear to be other animal pens. Most importantly, the discovery made by the officer could not have been made by sight (or smell) from an area outside the yard; he had to be right under the window unit to perceive the smell. In short, the back yard was within the curtilage of the house and Appellant Quintana had a reasonable

expectation of privacy in it. The officer did not have the right to be there absent a warrant, meaning any information he uncovered there (the "smell" of marijuana) was improper and thereby tainted the search warrant based on it. The evidence found as the result of the improperly obtained search warrant thus should have been suppressed.

## 2. Bottoms

■ Appellants Brian and Melissa Bottoms, however, are not entitled to suppression. Here, the officers did substantial investigation before going to do the knock and talk, even though they felt they did not have probable cause to get a warrant. They received the tip from the store manager, which they verified in part by observing the identified vehicle parked at Brian's residence. When they did go to his residence for the knock and talk, they properly requested his consent to search the residence, which Brian (properly) refused. The officers properly did not force the search, but used their observations from the knock and talk as further basis for probable cause to obtain a search warrant. The search was then conducted pursuant to the warrant.

Most telling in the context of the curtilage analysis, the officers at all times remained where they had a right to be in the course of a knock and talk and did not go beyond the public access areas. As such, a separate application of the *Dunn* factors is unnecessary.

## III. Conclusion

For the reasons stated above, the convictions of Appellant Quintana are reversed, and his case is remanded to the trial court for further proceedings consistent with this opinion. The convictions of Appellants Brian and Melissa Bottom are affirmed.

All sitting. All concur.