David MILAM, Appellant

v.

COMMONWEALTH of Kentucky,
Appellee

2013–SC–000681–DG

Supreme Court of Kentucky.

RENDERED: MAY 14, 2015

Rehearing Denied September 24, 2015

**348**

COUNSEL FOR APPELLANT: Fred E. Peters, Fred Peters Law Office, Rhey Denniston Mills, Fred Peters Law Office

COUNSEL FOR APPELLEE: Jack Conway, Attorney General of Kentucky, Kenneth Wayne Riggs Assistant Attorney General, Thomas Allen Van De Rostyne, Assistant Attorney General

OPINION OF THE COURT BY
JUSTICE CUNNINGHAM

In the fall of 2010, Appellant, David Zax Milam, was a member of the Delta Tau Delta fraternity at the University of Kentucky. He leased a room at the fraternity house that was located near the University campus. The house was owned by the fraternity. On November 30, 2010, University of Kentucky Police Detective John McBride received a tip that Milam was selling marijuana at the fraternity house. McBride and two other University police detectives, Jason Beetz and David Saddler, went to the house to perform a "knock and talk" investigation. The detectives did not have a warrant to search the house.

Upon arriving, the officers went to the back door. They mistakenly believed that the back door was the front door because it had large Greek letters above it, and it faced a major road and the fraternity's parking area. Detective Beetz testified at the first suppression hearing that the detectives knocked and rang the bell several times but no one responded. After a parley among themselves about their next step, they adduced that the fraternity house was more akin to an apartment complex than a private residence. Therefore, the detectives opened the door and entered. Although the back door had a keypad locking device, the door was unlocked and slightly "ajar."

The detectives entered across the threshold and into the foyer. They remained there for a brief period and announced their presence. Soon thereafter, a young man later identified as Delta Tau Delta member Matthew Neagli, entered

the foyer area from an adjoining room. Without asking him who he was or whether he was affiliated with the fraternity, the detectives identified themselves as police officers and said that they were looking for Appellant.

It is unclear from the evidence what conversation ensued at that point, and whether Neagli agreed to take them to Appellant's room. However, it is undisputed that the detectives followed Neagli up the stairs to the second floor where the fraternity residents had their individual rooms. In its oral findings on this issue, the trial court determined that, at the very least, this constituted implied consent by a third party.

Upon entry into the stairwell, the detectives could smell burnt marijuana. At the top of the stairwell, Neagli opened the door to the second floor. After Neagli identified Appellant's room by pointing, the detectives knocked on the door. Appellant opened the door, revealing the strong smell of marijuana. A full jar of marijuana was located on the coffee table inside the room, in plain view of the detectives. Appellant then provided consent for the detectives to search his bedroom. During the search, they discovered marijuana, $1,700, Adderall pills, drug paraphernalia, and a fake driver's license.

Appellant was charged with one count of trafficking in a controlled substance within 1,000 yards of a school, third-degree possession of a controlled substance, possession of drug paraphernalia, and second-degree criminal possession of a forged instrument. Appellant argued before the trial court that the detectives unlawfully entered and searched the house in violation of the Fourth Amendment. Several suppression hearings were held resulting in conflicting testimony. Ultimately, the trial court denied Appellant's motion to suppress the evidence discovered in his bedroom.

Thereafter, Appellant entered a conditional guilty plea conditioned on the appeal of the denial of his suppression motion. Pursuant to that agreement, Appellant pled guilty to the trafficking charge and was sentenced to one year imprisonment, probated for three years. The other charges were dismissed. The Court of Appeals affirmed the trial court's denial of Appellant's motion to suppress. After reviewing the record and the law, we reverse the decision of the Court of Appeals.

### Standard of Review

■ Our standard of review of the trial court's denial of a suppression motion is twofold. First, the trial court's findings of fact are conclusive if they are supported by substantial evidence; and second, the trial court's legal conclusions are reviewed de novo. *Commonwealth v. Marr*, 250 S.W.3d 624, 626 (Ky.2008); RCr 9.78.

■ The Fourth Amendment to the U.S. Constitution and Section 10 of the Kentucky Constitution protect citizens from unreasonable searches and seizures by the government. A basic tenet of Fourth Amendment law is that warrantless searches and seizures inside a home are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

### Search of Fraternity House

■ The legal question squarely before this Court as a matter of first impression is whether a fraternity house is considered a private residence or an apartment building or hotel for purposes of Fourth Amendment protections. The latter category typically involves buildings with common areas that are open to the public, thus allowing law enforcement officers to enter those common areas without first obtain-

ing consent. However, officers may not enter any part within a private residence absent an exception to the search warrant requirement.

It appears that every other jurisdiction that has addressed this question has determined that a fraternity house is a private residence. For example, in *Reardon v. Wroan*, the U.S. Court of Appeals for the Seventh Circuit cogently noted:

> Although there are certain similarities to the apartment building cases, fraternity residents clearly have a greater expectation of privacy in the common areas of their residence than do tenants of an apartment building. As the district court noted, fraternity members could best be characterized as "roommates in the same house," not simply co-tenants sharing certain common areas. Moreover, a fraternity, by definition, is intended to be something of an exclusive living arrangement with the goal of maximizing the privacy of its affairs.

811 F.2d 1025, 1030 (7th Cir.1987).

In *State v. Miller*, the Ohio Court of Appeals concluded that "a fraternity house should be treated as a home for purposes of Fourth Amendment protections." No. WD–10–027, 2011 WL 1167181, at *3 (Ohio App. March 31, 2011) (holding that the warrantless search of the fraternity house was unlawful); *see also State v. Pi Kappa Alpha Fraternity*, 23 Ohio St.3d 141, 491 N.E.2d 1129 (1986). Other jurisdictions have reached the same conclusion. *E.g., City of Fargo v. Lee*, 580 N.W.2d 580 (N.D.1998); *Idol v. State*, 233 Ind. 307, 119 N.E.2d 428 (1954); *State v. Houvener*, 145 Wash.App. 408, 186 P.3d 370 (2008).

The Commonwealth provides no contrary authority.

We agree with the instructive decisions presented by the Appellant and the reasons offered in support thereof. There-

fore, we hold that a fraternity house is a private residence for purposes of Fourth Amendment protections. We must now determine whether the detectives exceeded the scope of a knock and talk in the context of a private residence.

### Scope of Knock and Talk

Quintana v. Commonwealth is our controlling case governing knock and talk procedures. 276 S.W.3d 753 (Ky. 2008). In that case, we described the scope and purpose of the knock and talk procedure as follows:

> [w]hether an officer is where he has a right to be when he does the knock and talk is defined by his limited purpose in going to the residence and the nature of the area he has invaded. There has been no finding of probable cause sufficient to grant a warrant, so the knock and talk is limited to only the areas which the public can reasonably expect to access. While there is a right of access for a legitimate purpose when the way is not barred, or when no reasonable person would believe that he or she could not enter, this right of access is limited. *Id.* at 759.

The facts of *Quintana* involved investigating officers who went to the front entrance of the defendant's home and knocked on the front door. *Id.* at 755. After no response, one officer went to the back of the house. *Id.* While in the back yard, he smelled marijuana. *Quintana*, 276 S.W.3d at 755. The officers then procured a search warrant based on this information that lead to the subsequent discovery of contraband inside the residence. *Id.*

We held that the warrant was defective because the officers had gone beyond the area where the public was allowed to access in order to obtain the information that provided the basis for the

search warrant. Accordingly, we suppressed the evidence obtained as a result of the subsequent search of the defendant's home. In so holding, we determined that "[t]he crux of the validity of the knock and talk procedure is that it is a consensual encounter in a place where the officer, like the public, has a right to be." *Id.* at 759.

In light of our determination that a fraternity house is a private residence, it necessarily follows that the detectives in the present case, like the general public, had no right to enter the residence. Yet, the Court of Appeals erroneously determined that the fraternity residents did not have a reasonable expectation of privacy in the internal foyer area of the house. The court based its reasoning on the fact that the keypad locking device was broken and the back door was slightly ajar. Contrary to the Court of Appeals' determination, however, the status of the locking device is not dispositive. A citizen's greatest fortification against government intrusion into his or her home is the Fourth Amendment itself, not a lock. The doorless threshold of the shanty may defy entry to the state with the same constitutional empowerment as the barred and bolted mansion.

We further reason that within the walls of a fraternity house there is more of a heightened expectation of privacy than in a hotel or apartment building. Within these rooms, the residents partake in regular activities which are closed to the rest of the world. For instance, the fraternity's "nice room" that was located on the first floor and near which the detectives passed, has no standard counterpart in a hotel or apartment complex. It is a room in which fraternity members conduct private meetings and store their memorabilia used for the club's secret rites.

Without specific facts reasonably indicating that the residence was open to the public, it is also generally irrelevant whether the back door was closed, ajar, or wide open. When the detectives arrived at the house to perform the knock and talk, they were not greeted by a scene out of the movie Animal House. To the contrary, they arrived at the residence at 10 p.m. on a seemingly mundane week night.

In addition, the fraternity president testified that the fraternity by-laws required that the back door remain locked at all times. Only fraternity members and their guests were allowed entry. A photo was also introduced that displayed a private parking sign near the parking lot adjoining the rear entrance of the house.

Furthermore, the mere presence of a doorbell and the keypad lock indicates that the residents endeavored to exclude the general public. By knocking on the door and ringing the doorbell prior to their entry, the detectives acknowledged that the house was not open to the public. No fraternity member—nor inebriated porter as in Macbeth—answered their knocking. *See U.S. v. Gomez–Moreno*, 479 F.3d 350, 356 (5th Cir.2007) ("When no one answered, the officers should have ended the 'knock and talk' and changed their strategy by ... seeking a search warrant...."); *Quintana*, 276 S.W.3d at 759.

In support of its argument, the Commonwealth relies heavily on *U.S. v. Dillard*, 438 F.3d 675 (6th Cir.2006) (holding that defendant did not have a reasonable expectation of privacy in a duplex's common hallway and stairway for Fourth Amendment purposes). *Dillard* is readily distinguishable on its facts because it involved a duplex, not a fraternity house. *Id.* Any analogy between the present case and *Dillard* is further diminished by that court's determination that the defendant "did nothing to indicate to the officers that they were not welcome...." *Id.* at 682. As previously discussed, the back door en-

trance of the fraternity house contained a doorbell and keypad locking device, albeit a dysfunctional one. Therefore, the fraternity members—including Appellant—clearly indicated that the officers were not welcome to enter at their own discretion. Accordingly, the detectives exceeded the scope of the knock and talk procedure.

### Suppression

The evidence discovered as a result of the detectives' unlawful entry must be suppressed. *Wong Sun v. U.S.*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In *Quintana* for example, we ultimately determined that any information discovered as a result of the officer's unlawful presence within the curtilage "was improper and thereby tainted the search warrant based on it." The same logic applies here. Specifically, the detectives' unlawful entry irreparably tainted any consent allegedly obtained from Neagli. *City of Fargo*, 580 N.W.2d at 581 (suppressing evidence where parties disputed whether fraternity house occupant consented to officers' entry); *Idol v. State*, 119 N.E.2d at 431–32 (suppressing evidence even though police first obtained consent from defendant's fraternity house manager to search fraternity premises). The Commonwealth bears the burden of demonstrating that consent was freely obtained. *Davis v. Commonwealth*, 398 S.W.2d 701 (Ky.1966).

The conclusive facts demonstrate that the detectives never inquired as to Neagli's common possessory interest in the residence. *See* Leslie W. Abramson, 8 Kentucky Practice, *Criminal Practice and Procedure* § 18:187 (2014) (citing *Sanders v. Commonwealth*, 609 S.W.2d 690 (Ky. 1980)). The detectives did not even ask Neagli his name. It is also clear that Neagli never affirmatively consented to a search of the residence. Therefore, while Neagli never expressly protested the detectives' presence, it would strain credulity to hold that his alleged consent was either informed or "freely obtained." Compare *Stevens v. Commonwealth*, 354 S.W.3d 586 (Ky.App.2011) (reversing trial court's order suppressing evidence where third party consent to search premises was express, in writing, and sufficiently removed from the initial illegality).

We cannot overlook the vastly incongruous situation Neagli faced when he happened upon the presence of multiple law enforcement officers inside his home. At that point, the scales had already tipped in favor of the detectives. When faced with a similar situation, few lay persons would muster the courage to protest the officers' presence. *See Amos v. United States*, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); *Elmore v. Commonwealth*, 282 Ky. 443, 138 S.W.2d 956 (1940) (following *Amos* and holding that alleged third party consent to search residence was implicitly coerced and, thus, invalid). At that juncture, it is highly unlikely that the young college student would even know he had a choice. Therefore, the Commonwealth's attenuated allegations of third party consent in this case are unpersuasive and cannot cure the detectives' initial entry. Accordingly, the evidence discovered as a result of the detectives' unlawful entry of the fraternity house must be suppressed.

### Conclusion

For the foregoing reasons, we reverse the Court of Appeals' decision affirming the trial court's denial of Appellant's motion to suppress evidence obtained from the unlawful search of his residence. We vacate Appellant's guilty plea and remand this case to the trial court for further proceedings consistent with this opinion.

All sitting. All concur.