RENDERED: FEBRUARY 18, 2016
TO BE PUBLISHED

$\mathfrak{Supreme\ Court\ of\ Kentucky}$

2014-SC-000511-DG

FINAL

DATE 3-10-16 Saut Grauth P.C.

COMMONWEALTH OF KENTUCKY                                      APPELLANT


V.

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2012-CA-002188-MR
HART CIRCUIT COURT NO. 12-CR-00133


PHILLIP DIXON                                                APPELLEE


**OPINION OF THE COURT BY JUSTICE KELLER**

**REVERSING**

Phillip Anthony Dixon entered a conditional guilty plea to drug charges

following the denial of his motion to suppress. The Court of Appeals reversed

and remanded the denial and the judgment of conviction. This Court granted

the Commonwealth's motion for discretionary review, and we reverse the Court

of Appeals.

**I.   BACKGROUND.**

Kentucky State Police (KSP) received an anonymous complaint that

Phillip Dixon was using and making methamphetamine in his home. KSP

Troopers Charles White and Jeremy Smith went to the address provided by

police dispatch to investigate. On arrival, they discovered that the address

belonged to Dixon's mother who told them that Dixon lived in a nearby trailer

separated from her house by woods. The troopers proceeded down a nearby

gravel road, passed at least two more residences, and located Dixon's trailer at the end of the road.

The troopers noted several indications of methamphetamine production at Dixon's trailer, including: an open fire burning near the front door, which smelled like burning plastic; windows covered from the inside; and four vehicles parked in the driveway. The troopers approached the front door in order to perform a warrantless knock and talk, but before they reached it, Dixon came out of the trailer and met them in front of the porch.

As Trooper White and Dixon spoke, Trooper Smith walked along the outskirts of the maintained area surrounding the trailer to watch for anyone attempting to flee through the back door. Dixon told Trooper White that he would like to cooperate but would not allow the troopers to search his home without a warrant. Immediately thereafter, Trooper Smith radioed from his position behind the trailer and reported that he could see two 20-ounce bottles containing white residue that appeared to be one-step methamphetamine labs near the back porch. Trooper White and Dixon joined Trooper Smith at his position in tall grass, about 15 feet from the back porch. From this location, both troopers saw smoke emanating from the open back door and smelled a chemical odor consistent with methamphetamine production.

Based on these observations, the troopers believed that the trailer was housing an active methamphetamine lab. Trooper White asked Dixon if there was anyone else inside, and Dixon replied that he had friends inside. Acting pursuant to what they believed to be exigent circumstances, the troopers

2

entered the trailer and evacuated the occupants for safety reasons. During their protective sweep, the troopers observed methamphetamine precursor chemicals and three more bottles that also appeared to be one-step labs in plain view. Based on his observations inside and outside of the trailer, Trooper White immediately contacted a KSP clean-up unit and obtained a search warrant for further investigation.

Dixon was charged with numerous drug-related criminal offenses in a twelve-count indictment. Dixon moved to suppress all the evidence collected from his trailer and argued that the troopers had unlawfully exceeded the scope of the knock and talk by entering the protected curtilage of his residence. The trial court held a suppression hearing, and Trooper White testified consistent with the facts set forth above. Specifically as to the issue of curtilage, Trooper White testified as follows:

| **Trooper White:** | As I approached the front door, Mr. Dixon, which was the one we received the complaint on, exited—comes out of the front door and meets us there right in front of his porch. |
|---|---|
| **Commonwealth:** | Let me stop you. Was Trooper Smith with you at that time as well in front of the residence? |
| **Trooper White:** | He was. But as I began to speak, actually as I went toward the front door, Mr. Dixon met me, Trooper Smith went outside the curtilage around the residence to the backside. There was just a small area in front of this house that was even mowed—that was taken care of. He went around the gravel drive, around the outside curtilage, to the back corner of this residence. There's a pond to the left-hand |

3

side, it's grown up weeds in that area, that's the area he was standing in watching the back door.

**Commonwealth:** And why would he have done that?

**Trooper White:** Like I said, it was a drug complaint, wanted to make sure that no one had run out the back door—that effect—while I was speaking to Mr. Dixon.

. . .

**Commonwealth:** Now, you describe Trooper Smith as going around outside the curtilage. Can you describe how far he would have been from that back deck when he would have observed those bottles there?

**Trooper White:** Like I said, it was—this was not maintained well. There was barely enough room to walk around that trailer as far as what had been mowed, so he was—I would say—15 feet away from the trailer, which is this pond is probably 25 feet from the trailer, just guessing.

**Commonwealth:** Fence around the trailer or anything?

**Trooper White:** No, there's no fence. It just simply leads into a grassy area—a tall grass area—there's a pond and then the rest of it is all wooded.

. . . [on cross-examination]

**Defense Counsel:** In front of the residence was the grass mowed down?

**Trooper White:** Just a short patch in front of it but not all the way. There was a gravel drive that went down in front of the residence and went down into the woods, but it wasn't maintained.

**Defense Counsel:** Okay, so in the back it wasn't maintained?

4

| | |
|---|---|
| **Trooper White:** | Just like I said, just a small area was maintained at all. |
| **Defense Counsel:** | And that was only in the front of the residence? |
| **Trooper White:** | Like I say, mowed—looked like the width of one mower went around the edge of the trailer to the back. |
| **Defense Counsel:** | And while you were in front, that was when Trooper Smith went around back? |
| **Trooper White:** | While I encountered Mr. Dixon he was around the back corner. |
| **Defense Counsel:** | Was he with you originally? |
| **Trooper White:** | Just when we got out of the residence—got out at the residence. I seen him start toward me but then he went on around the back corner. |

Near the end of Trooper White's testimony, defense counsel admitted two photographs of the rear of Dixon's trailer. The photographs show one plastic bottle on a small back porch or deck and the trailer's backdoor slightly ajar. The area surrounding the back of Dixon's trailer appears overgrown with tall grass and trees, and it is littered with trash and other debris. There also appears to be another structure, resembling a residence, to the left of Dixon's trailer visible through the trees. After Defense Counsel concluded his cross-examination of Trooper White, the trial court sought a brief clarification of the photographs:

| | |
|---|---|
| **Trial Court:** | What I am concerned about—I'm not understanding—can you show me or make a mark where the other detective was? You said he was outside the curtilage, but |

|  |  |
|---|---|
|  | it looks like a pig sty back there to be perfectly honest. |
| **Trooper White:** | The picture doesn't go back far enough to show where he was standing. This is the strip of the grass going around [pointing to the photograph]. He's back, back over here [again pointing to the photograph]. |
| **Trial Court:** | Okay, so he is beyond anything in the photograph? |
| **Trooper White:** | Yes. |

Due to the angle of the courtroom camera and the photograph, the video record does not reveal where Trooper White pointed.

Trooper White was the only witness to testify at the hearing; Dixon, although present, did not testify. Following arguments by both parties, the trial court denied the suppression motion from the bench. In a subsequent written judgment, the court applied *United States v. Dunn*, 480 U.S. 294 (1987)'s four-factor analysis and found, according to Trooper White's uncontroverted testimony, that Trooper Smith walked around or outside of the trailer's curtilage and thus the search was lawful. Pursuant to a subsequent plea agreement, Dixon entered a conditional guilty plea to complicity to manufacture methamphetamine, complicity to possess marijuana, and complicity to possess drug paraphernalia, and the trial court sentenced him to ten years' imprisonment.

The Court of Appeals reversed and remanded. The Court also considered the *Dunn* factors, but found, in accordance with *Quintana v. Commonwealth*, 276 S.W.3d 753 (Ky. 2008), that the troopers did not have a right to venture

6

away from the front of the house pursuant to a knock and talk and to invade the curtilage of Dixon's residence when they stood 15 feet from his trailer. This Court granted the Commonwealth's petition for discretionary review.

## II. STANDARD OF REVIEW.

The factual findings of the trial court in a suppression matter are conclusive so long as they are supported by substantial evidence; thus "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Commonwealth v. Ousley*, 393 S.W.3d 15, 22-23 (Ky. 2013). "Using those facts, the reviewing court then conducts a *de novo* review of the trial court's application of the law to those facts to determine whether the decision is correct as a matter of law." *Commonwealth v. Jones,* 217 S.W.3d 190, 193 (Ky. 2006).

## III. ANALYSIS.

Because KSP ultimately obtained a search warrant based on the observations of Troopers White and Smith from behind Dixon's trailer, the issue requiring resolution in this case is whether the troopers made those observations from a lawful vantage point.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A "search" occurs for purposes of the Fourth Amendment when the government invades an individual's reasonable expectation of privacy. *Smith v. Maryland,* 442 U.S. 735, 739–40 (1979)

7

(discussing *Katz v. United States*, 389 U.S. 347 (1967)). An individual enjoys a reasonable expectation of privacy in "curtilage," which is the area immediately surrounding a house that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dunn*, 480 U.S. at 300 (internal quotations omitted). However, an individual has no reasonable expectation of privacy in an "open field," the area outside a home's curtilage.[1] *Oliver v. United States*, 466 U.S. 170, 179 (1984).

In *United States v. Dunn*, the Supreme Court sought to clarify the line between protected curtilage and unprotected open field. The Court held that a barn, which was located 60 yards from the home and not within the area enclosed by a fence surrounding the house, was outside of the home's protected curtilage. 480 U.S. at 301. In so doing, the Court created a four-factor analysis for determining protected areas:

> [C]urtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.*

The Court addressed how police may lawfully search curtilage in *California v. Ciraolo*, 476 U.S. 207 (1986). There, it was undisputed that the

---

[1] "Open field" is a term of art. The term "may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech. For example, . . . a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." *Oliver v. United States*, 466 U.S. 170, 180 n. 11 (1984).

place to be searched, i.e. a fenced-in backyard, was within the protected curtilage. *Id.* at 213. Nonetheless, the Court found that police did not violate the Fourth Amendment when they performed a warrantless search of the backyard from an airplane flying in navigable airspace. *Id.* at 215. The Court reasoned that the fact "[t]hat the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares." *Id.* at 213.

Subsequently in *Florida v. Riley*, the Court relied on *Ciraolo* and maintained, "our reasoning [in *Ciraolo*] was that the home and its curtilage are not necessarily protected from inspection that involves no physical invasion . . . . As a general proposition, the police may see what may be seen 'from a public vantage point where [they have] a right to be.'" 488 U.S. 445, 449 (1989) (alteration in original) (quoting *Ciraolo*, 476 U.S. at 213). The *Riley* Court went on to hold that no warrant was required when police searched a backyard greenhouse from 400 feet above in a circling helicopter. *Id.* at 452.

With this federal precedent in mind, we considered the connection between curtilage and knock and talk procedures in *Quintana v. Commonwealth*, 276 S.W.3d 753 (Ky. 2008). There, after thoroughly discussing the Fourth Amendment ramifications when police approach a residence without a warrant, we held:

> Instead of falling directly under the knock and talk rule, as the
> Sixth Circuit has held, when an officer leaves the approach to the
> main entrance of a residence, a separate and distinct curtilage

9

question arises. The trial court is tasked with determining separately whether the new area where the officer ventures is within the protected curtilage of the home. To determine this, the four-factor analysis of *Dunn* must be applied: proximity to the house, whether the area is enclosed with the house, how the area is being used, and what the resident has done to secure his privacy. If the area is determined to be within the protected curtilage, then the officer is not in a place where he has a right to be, and any evidence thus illegally seized must be suppressed. *United States v. Jenkins,* 124 F.3d 768 (6th Cir.1997).

*Id.* at 760. Thus, when police depart from ordinary knock and talk procedure, i.e. do something other than approach the main entrance of a house just as any member of the public might, the trial court must determine whether the new vantage point taken up by the officer is within the protected curtilage of the home. To make this determination, the trial court should treat the question like any other curtilage question and analyze the *Dunn* factors. If that vantage point is within the curtilage, any observations may not be relied on as they are the product of an illegal search; however, if that vantage point is outside the curtilage, the officer is free to look into the curtilage in accordance with *Ciraolo* and *Riley.*

Finding no reason to depart from this analysis, we analyze the *Dunn* factors in turn.

## A.    Proximity to the Residence.

The trial court found that Trooper Smith's vantage point (the vantage point) was "about 15 feet" from the rear of Dixon's trailer, and Trooper White's testimony supports this factual finding.

10

The Court of Appeals found this proximity "highly significant" to its conclusion that the vantage point was within the trailer's curtilage. The Court reasoned that while areas which are hundreds of feet from a residence are unlikely to be within the curtilage, areas within a few feet from a residence are usually within curtilage.[2]

While we cannot disagree with this general proposition and believe that, devoid of all context, an area that is 15 feet from a residence may well be within curtilage, we reiterate the purpose of the four-factor analysis. The factors are not meant to be "mechanically applied . . . . Rather, [they] are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection." *Dunn*, 480 U.S. at 301 (internal quotations omitted). There is no doubt that proximity can create intimacy and that Trooper Smith's proximity to the trailer falls in Dixon's favor; however, we must consider the underlying context of this proximity before we can affix its significance.

---

[2] For support, the Court cited *Dunn*, 480 U.S. at 301-02 (holding that a barn located 60 yards from the residence was not within the curtilage); *Dunn v. Commonwealth*, 360 S.W.3d 751, 757-58 (Ky. 2012) (holding that the area searched by police was "more than 300 to 400 feet" from the residence and was not within the curtilage); *Ousley*, 393 S.W.3d at 28-29 (holding that trash cans located "no farther away than the far side of his narrow driveway" or "pretty close" or a "very short distance" from the residence was within the curtilage); and *Quintana*, 276 S.W.3d at 760-61 (holding that when an officer walked 30 to 40 feet across a backyard to a window air conditioning unit on the far end of the house, he was within the curtilage).

**B.    Whether the Vantage Point Is Included Within an Enclosure Surrounding the Residence.**

The trial court found that there was no evidence of any enclosure behind the trailer, and the record supports this finding. The Court of Appeals found that this fact supported the conclusion that the vantage point was not within the curtilage, and we agree. Like proximity, lack of a fence is not dispositive; however it does weigh in favor of the Commonwealth's argument that the vantage point was outside the "umbrella" of Dixon's trailer. *Compare Ciraolo*, 476 U.S. at 211 (defendant "took normal precautions to maintain his privacy" by erecting a fence) (citation omitted), *with Widgren v. Maple Grove Twp.*, 429 F.3d 575, 582 (6th Cir. 2005) ("erecting a fence likely would have added little privacy in this remote rural location").

**C.    How the Vantage Point Is Being Used.**

As mentioned above, Trooper White was the only witness to testify; thus, the trial court was only guided by his testimony and the photographs. There were relatively few facts found concerning the use of the vantage point. The findings and the record are clear that the vantage point was in tall, unmaintained grass. In addition to those facts, the trial court found that the area behind the trailer was in a "pigsty condition" and "basically a dumping ground," findings that the photographs support. The court also stated that Trooper Smith "stood in taller grass which was situated behind the photographer, and as a result, is not depicted in the photographs." Thus, it is unclear whether the vantage point was outside the perimeter of the "dumping ground" or inside it.

12

The Court of Appeals said that the evidence did not show that this back area was used as an extension of the residence. Again, we agree. On the other hand, Dixon argues that the back area was "littered with his personal effects" and thus the vantage point was within the curtilage of his trailer. This position is not supported by the facts. There is no evidence that the vantage point was within the "dumping ground." Even if that evidence existed, there is nothing in the record to support the argument that Dixon was using this area as his own dump or that the debris was Dixon's property. A court could just as reasonably infer, and perhaps the trial court did, that the area was a "dumping ground" for others, thereby negating any expectation of privacy. Moreover, if the vantage point was not within the "dumping ground" then that would support the Commonwealth's argument that it bore no intimate connection with Dixon's trailer.

**D.    What the Resident Has Done to Secure His Privacy.**

The trial court specifically stated that there was "no evidence that Dixon had taken any action to secure his privacy behind the trailer." This finding is supported by Trooper White's testimony that there was no fence or sign posted near the trailer. Moreover, because Dixon did not testify, the record is bare as to any other actions he may have taken to secure his privacy.

The Court of Appeals inferred facts that are not supported by the record regarding this factor. The Court stated that "Dixon went to great lengths to secure his privacy. He placed his trailer away from his mother's house [and it] was also located far way from any neighbors at the end of a gravel road." The

13

record does not support these facts. Trooper White testified that Dixon's trailer was "about a tenth of a mile" away from his mother's residence and at the end of a gravel road. But there is no evidence that Dixon purposely "placed" his trailer in that location or for that purpose. Furthermore, Trooper White testified that he passed at least two other residences on the gravel road leading up to Dixon's trailer. There is no evidence that Dixon isolated himself from these other neighbors; in fact, one of the photographs shows what appears to be another residence through the trees and within sight of Dixon's trailer.

The Court of Appeals also stated that the long grass, itself, shielded the back area from view and communicated that visitors were not welcome to access it. This inference, although potentially reasonable, is also not supported by the evidence. There is no evidence that the grass impeded visibility. While there is evidence that a narrow strip of grass around the trailers was mowed, there is no evidence that Dixon was the mower or that whoever mowed the strip intentionally left the back area unmaintained. Moreover, a court could just as likely infer that the mower did not mow this area because he or she had no use for it or no ownership interest in it.

**E.    Additional Evidence.**

The Commonwealth carried the burden in this case to demonstrate that the warrantless entry falls within a recognized exception to the warrant requirement, and part of that burden was proving that the vantage point was outside of the curtilage. *King v. Com.*, 386 S.W.3d 119, 122 (Ky. 2012). We are

14

satisfied that the Commonwealth met its burden when Trooper White unequivocally testified that Trooper Smith did not invade the curtilage.

We are generally hesitant to be persuaded by such a conclusive statement from a witness. However, we cannot fault the trial court for relying on such testimony when it was uncontested and further, supported by the facts as outlined above. Dixon was free to attack this conclusion through cross examination or conflicting testimony but he failed to do so. He did not ask Trooper White to define his understanding of curtilage; he did not question Trooper White's line of sight; nor did he inquire as to how Trooper Smith proceeded to the vantage point. Perhaps more importantly, Dixon did not offer any testimony as to his use of the area in question nor any testimony regarding any affirmative steps he may have taken to secure its privacy.

Therefore, based on the totality of the *Dunn* factors, as well as Trooper White's uncontroverted testimony, we hold that neither trooper unlawfully encroached on the trailer's curtilage. Thus, Dixon's Fourth Amendment rights were not violated when Trooper White later relied on his observations to enter the trailer according to exigent circumstances and ultimately obtain a search warrant.

## IV. CONCLUSION.

For the reasons stated above, we reverse the Court of Appeals and reinstate the trial court's judgment.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Andy Beshear
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General

COUNSEL FOR APPELLEE:

Erin Hoffman Yang
Assistant Public Advocate