RENDERED: DECEMBER 9, 2022; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1169-MR

ARRIN EDWARD BUSH                                            APPELLANT

v.              APPEAL FROM KENTON CIRCUIT COURT
HONORABLE KATHLEEN S. LAPE, JUDGE
ACTION NO. 18-CR-00434

COMMONWEALTH OF KENTUCKY                        APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE: GOODWINE, K. THOMPSON, AND L. THOMPSON, JUDGES.

THOMPSON, K., JUDGE: Arrin Edward Bush appeals from his conviction and

sentence by the Kenton Circuit Court after a jury trial, arguing various trial errors.

We reverse his conviction and sentence based on improper character evidence and

remand.

            Bush was indicted for criminal attempt to commit rape in the first

degree and three counts of sexual abuse in the first degree for acts he committed

against H.C. (victim) on February 19, 2018. The three-day jury trial, held on May 14-16 of 2019, included testimony given by other juveniles Bush supposedly groomed, victim, M.C. (victim's sister), various detectives, and expert witnesses. Bush and his wife testified for the defense.

Bush was convicted on all counts and the jury recommended a total sentence of fifteen years of incarceration (ten years on count one, one year on count two, and two years each on count three and four to be served consecutively). On July 8, 2019, through the Judgment and Sentence on Verdict, Bush was sentenced in accordance with the jury's recommendation.

Bush knew the twelve-year-old victim as Bush was a family friend. Bush played softball with victim's father, and her mother often babysat Bush's infant son. On February 19, 2018, Bush asked victim's mother to babysit, explaining that both his wife and son were ill, and Bush needed to run errands. Victim's mother was unavailable to babysit, so victim volunteered to babysit instead.

Bush picked victim up from her home and drove her to his house in Covington, Kentucky. Victim alleged that, upon arrival, the baby was already in his crib and Bush immediately instructed his wife to go into the bedroom. Once his wife was out of the room, victim alleged that Bush sexually assaulted her on his

couch. Part of the alleged assault involved Bush rubbing his penis on the outside of victim's vagina.

At some point, victim asked to be taken home and Bush did so. Once home, victim told her friend, then her parents, what had just happened. Her mother drove her to the police station to report the incident, then to the emergency room and St. Elizabeth Hospital, and finally to the emergency room at Cincinnati Children's Hospital.

Victim tested positive for chlamydia on the day of the incident but was negative when tested by a physician on the following day. Unrefuted expert testimony at trial revealed that if the perpetrator of sexual assault had rubbed his penis in the victim's vaginal area, any secretions left by the perpetrator could have caused the positive chlamydia test without resulting in victim being infected. Several days later, after his arrest, Bush tested positive for chlamydia.

Bush's testimony was that he was in fact the victim of sexual assault by victim which occurred while he was sleeping. Bush testified his wife and son were sick, and he needed a babysitter to help his wife with the baby as he was supposed to go help his dad. He noted that his home is very small, and the bedroom door does not close because a chest of drawers sticks out too far. He explained he originally wanted victim's mother to babysit but agreed to have victim watch the baby. Once it became clear his father was not going to call him,

Bush testified he decided to take a nap, took his sleeping medication, and fell asleep on the couch.

Bush testified he woke up to his wife screaming and shaking him and that victim was pulling her hand out of his pants. According to Bush, his wife was screaming at the victim "What are you doing?" and said victim had to go. He then took the victim home. Later, Bush learned that his father had died that day. Bush explained that he did not tell victim's family about what she had done because he was embarrassed to be the victim of a sexual assault and did not think anyone would believe him.

Bush's wife testified consistently with Bush. She explained after Bush's father failed to call, Bush told her he needed to get some sleep because he had been up all the previous night with their sick baby, and she gave him his prescription sleep medicine. Bush's wife stated that because Bush normally sleeps with a C-PAP machine, she came out to check on him to make sure he was still breathing. She saw her husband was asleep, victim was on her phone, and victim's other hand was in Bush's pants. Bush's wife testified she was shocked, she screamed, her husband did not wake up, she had to shake him awake and told him: "You need to get her out of here." Victim asked to use the bathroom, they let her, and then Bush took victim home.

Bush's wife said she and Bush discussed afterwards what they should do as they did not believe that anyone would believe what had happened. She then called a friend whose husband is a lawyer and based on their advice hired a lawyer.

Bush raises numerous arguments on appeal. He contends that the trial court erred when it: (1) allowed numerous incidents of improper character evidence in violation of Kentucky Rules of Evidence (KRE) 404(b); (2) prohibited Bush from introducing evidence that other men's DNA was found in victim's panties; (3) allowed Detective Ross of the Covington Police Department to improperly bolster victim's testimony; (4) allowed questioning and evidence to be introduced that violated Bush's constitutional rights; and (5) permitted the sentencing phase to be tainted by incorrect information. For the reasons stated herein, we agree that the trial court improperly admitted character evidence in violation of KRE 404(b) and reverse and remand on that basis. We address all remaining issues only to the extent we believe they will arise again on remand. *See Southworth v. Commonwealth*, 435 S.W.3d 32, 55 (Ky. 2014).

KRE 404(b) states, in relevant part, that:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible:

(1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident; or

(2) If so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

The Kentucky Supreme Court has consistently interpreted KRE 404(b) as exclusionary in nature because "[i]t is a well-known fundamental rule that evidence that a defendant on trial had committed other offenses is never admissible unless it comes within certain exceptions, which are well-defined in the rule itself." *Commonwealth v. Buford*, 197 S.W.3d 66, 70 (Ky. 2006) (quoting *Bell v. Commonwealth*, 875 S.W.2d 882, 889 (Ky. 1994) (quoting *Jones v. Commonwealth*, 303 Ky. 666, 198 S.W.2d 969, 970 (1947))).

We review a trial court's ruling regarding admission of evidence under an abuse of discretion standard. *Kerr v. Commonwealth*, 400 S.W.3d 250, 261 (Ky. 2013) (footnote omitted).

Trial courts must apply KRE 404(b) cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime. To determine whether evidence of prior bad acts is admissible, we must decide if the evidence is relevant for some purpose other than to prove the criminal disposition of the accused, probative as to the actual commission of the prior bad act, and not overly prejudicial under KRE 403.

*Id.* at 260 (internal quotation marks, footnotes, and brackets omitted).

Prior to the trial, the Commonwealth filed numerous notices pursuant to KRE 404(c) which detailed its intent to call witnesses whose testimony would offer proof of Bush's *modus operandi*. At trial, the Commonwealth called twelve-year-old H.M.; H.M.'s legal guardian; thirteen-year-old E.W.; and sixteen-year-old M.D. to testify about what it called Bush's "grooming" behaviors as proof of *modus operandi*. On appeal, Bush argues the testimony of H.M., H.M.'s guardian, E.W., and M.D. was improperly admitted because it did not demonstrate *modus operandi* and, therefore, did not fall under one of the exceptions enumerated in KRE 404(b). We agree.

"If the proof in this case is to be considered *modus operandi,* then there must be such similarity between the proof offered and the facts at trial that the identity of the defendant can be determined from the similarities." *Southworth*, 435 S.W.3d at 53.

> [I]t is not the commonality of the crimes but the commonality of the facts constituting the crimes that demonstrates a modus operandi. Although it is not required that the facts be identical in all respects, evidence of other acts of sexual deviance . . . must be so similar to the crime on trial as to constitute a so-called signature crime.

*Dickerson v. Commonwealth*, 174 S.W.3d 451, 469 (Ky. 2005) (internal quotation marks and citation omitted).

We first turn to the testimony of H.M. The Commonwealth's notice provided in relevant part:

> During the investigation, H.M. disclosed that she met [Bush] through her mother, who lived next door to [Bush]. After meeting [Bush], H.M. indicated [Bush] bought her a birthday gift and began texting her on Snapchat. H.M. stated [Bush] would ask her about clothing and send her pictures of clothing. H.M.'s guardian learned of the conversations and blocked [Bush]. H.M.'s guardian deleted the conversations at that time.
>
> . . .
>
> [Bush] gained access to [victim] in the instant case through [his] relationship with her family. Similarly, [Bush] met H.M. through his relationship with her mother. [Victim] and H.M. were both 12 year old, [sic] Caucasian females at the time [Bush] began having contact with them. [Bush] was stopped before he was able to gain physical access to H.M. because H.M.'s guardian observed the conversation [on Snapchat]. [Bush] was released on bond in the instant case when he initiated contact with H.M.

At the trial, the testimony of both H.M. and her legal guardian were consistent with the Commonwealth's notice. However, the testimony did not go towards *modus operandi*. There was nothing distinct, unique, or signature mode of conduct which connected Bush's interactions with H.M. and his alleged interactions with victim. Most importantly, Bush has not been accused of sexual misconduct against H.M. Bush is not alleged to have purchased gifts for victim or to have communicated with her on Snapchat as he did with H.M. H.M. testified

-8-

that she had never been inside Bush's home, where he is alleged to have assaulted victim.

We next turn to the testimony of M.D. and E.W. In its notice regarding M.D., the Commonwealth indicated it intended to introduce evidence that:

> [O]n multiple occasions [Bush] paid for juvenile M.D. to take an Uber to his house. M.D. disclosed that she went to [Bush's] house approximately two to three times. She stated that each time she was provided transportation by [Bush] using Uber. She stated he would ask her to come alone but she refused. She also stated that she had to repeatedly tell [Bush] she would not date him.

M.D.'s testimony at trial was generally consistent with what the Commonwealth provided in its notice. Similarly, E.W. also testified that Bush transported her to his home by sending an Uber to pick her up. Once at Bush's home, both juveniles testified that alcohol and marijuana were offered to them and being consumed by others present in Bush's home.

However, there were no factual similarities between Bush's interactions with M.D. and E.W. and his alleged interactions with victim other than their young ages. Bush has not been accused of sexually assaulting M.D. or E.W. Bush did not transport victim to his home using Uber as he did with M.D. and E.W. While victim did allege that Bush offered her alcohol during another

uncharged incident in another jurisdiction, victim did not allege that Bush offered her alcohol or marijuana on the day in question.

> [E]vidence of other acts cannot be used to show a propensity or predisposition to again commit the same or a similar act. This is a codification of the "venerable rule that a defendant may not be convicted on the basis of low character or criminal predisposition, *even though* such character or predisposition makes it appear more likely that the defendant is guilty of the charged offense."
> *Billings v. Commonwealth*, 843 S.W.2d 890, 892 (Ky. 1992).

*Southworth*, 435 S.W.3d at 48.

While the behavior of Bush with H.M., M.D., and E.W. could be viewed as "creepy" or "inappropriate," it does not meet the standard of *modus operandi*. When considering the charges against him pertaining to victim, nothing about Bush's interactions with the other juveniles was so similar that it could be considered a signature crime. Notably, Bush has not been charged in relation to his interactions with any of the other juveniles. None of them testified that Bush touched them inappropriately or, in fact, touched them at all.

In ruling from the bench that it would allow the testimony, the trial court acknowledged it was prejudicial, but showed a method of establishing an inappropriate relationship with girls of similar ages as evidence of *modus operandi*. The problem with the trial court's reasoning is that the evidence did not show a consistent, signature method used by Bush to establish a relationship with

juvenile females in the commission of sexual crimes. Accordingly, the trial court abused its discretion by allowing admission of the testimony of H.M., H.M.'s guardian, M.D., and E.W.

We must now consider whether admission of the testimony was harmless error pursuant to Kentucky Rule of Criminal Procedure (RCr) 9.24, which states as follows:

> No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.

As noted, numerous juveniles testified regarding behaviors of Bush. The Commonwealth repeatedly referred to the behaviors as "grooming" and it was a crucial part of the Commonwealth's theory of the case. In all, four of the sixteen witnesses called by the Commonwealth (or one fourth) testified regarding prior bad acts of Bush that did not involve victim. In its closing argument, the Commonwealth repeatedly referred to Bush's "grooming" behaviors from the testimony, stating, in part:

> Sexual predators, they groom children. They have grooming behaviors. And what that means is that they do

-11-

things like try to be around children. They try to isolate children, they try to get children into a position where the parents aren't around. They do things like buy gifts. They give drugs and alcohol to children. They make jokes and bring up topics that are adult in nature. This is grooming. This is how sexual offenders operate. The defendant, he employed an array of grooming techniques. Think of what you have heard he has done during this case.

Again, none of the "grooming techniques" the Commonwealth claimed were used on the juveniles who testified were alleged to have been used by Bush on victim in relation with the charged crimes. Yet, the evidence regarding "grooming" of other children was pervasive and we cannot say that its admission did not violate Bush's substantial rights pursuant to RCr 9.24. Therefore, it was not harmless error and reversal for a new trial is warranted.

Bush also argues that the portion of the testimony of victim's sister pertaining to Bush's offering her alcohol while on a houseboat with victim was improperly admitted in violation of KRE 404(b). We disagree. Victim's sister testified as a witness to a prior sexual act perpetrated by Bush on victim while the sisters were visiting Bush on a houseboat.[1] "[E]vidence of similar acts perpetrated against the same victim are almost always admissible[.]" *Whaley v. Commonwealth*, 567 S.W.3d 576, 587 (Ky. 2019) (quoting *Noel v. Commonwealth*,

---

[1] It was revealed at trial that the events on the houseboat occurred in Campbell County, Kentucky, and therefore were not part of the crimes charged against Bush in the instant action.

76 S.W.3d 923, 931 (Ky. 2002), which connects these similar acts to the KRE 404(b)(1) exceptions for evidence offered to prove intent, plan, or absence of mistake or accident). Victim's sister's testimony provided context to the party-like atmosphere on the houseboat and how Bush was able to gain access to victim even in victim's sister's presence. The trial court did not abuse its discretion in allowing the testimony.

Bush's second argument pertains to the DNA found in victim's underwear. The analysis conducted by the Kentucky State Police Crime Laboratory determined that victim's underwear was presumptively positive for saliva. The underwear was then submitted for DNA testing and DNA foreign to victim was found but it was too limited for meaningful comparison. Additional testing determined a mixture of DNA from at least three males. The analysis did not exclude Bush as a contributor, but he was unable to be conclusively identified as a contributor.

After receiving these results, the Commonwealth filed a motion *in limine* to exclude the DNA results pursuant to Kentucky's "Rape Shield Law," KRE 412. Because the trial court excluded evidence of the other contributors to the DNA evidence, the parties entered into the following stipulation which was read and submitted to the jury:

> The parties have stipulated that items were submitted to the Kentucky State Police Forensic Lab for testing.

Item 1.6 came back presumptively positive for saliva. Item 1.6 was [victim's] underwear.

The item was sent for DNA testing and that test found that DNA foreign to [victim] was present. However, the results were too limited for meaningful comparison.

The results are inconclusive, but do not rule out [Bush].

Bush argues the evidence that there was DNA from three different men in victim's underwear should have been admissible because it was evidence that someone else was the source of the DNA, supported his defense that victim was the aggressor, and provided an alternate explanation for how a child who was assumed to be chaste may have tested positive for chlamydia. We agree with the trial court that evidence pertaining to the presence of other men's DNA in victim's underwear was inadmissible under KRE 412.

KRE 412 governs the admissibility of a victim's behavior and sexual predisposition. KRE 412 serves "to prevent the victim in a sexually related crime from becoming the defendant at a trial." *Smith v. Commonwealth*, 566 S.W.2d 181, 183 (Ky.App. 1978). It prevents the introduction of evidence that is neither material nor relevant to the crime charged. *Anderson v. Commonwealth*, 63 S.W.3d 135, 140 (Ky. 2001). KRE 412 states, in relevant part:

> (a) Evidence generally inadmissible. The following evidence is not admissible in any civil or criminal proceeding involving alleged sexual misconduct except as provided in subdivisions (b) and (c):

> (1) Evidence offered to prove that any alleged victim engaged in other sexual behavior.
>
> (2) Evidence offered to prove any alleged victim's sexual predisposition.
>
> (b) Exceptions:
>
> > (1) In a criminal case, the following evidence is admissible, if otherwise admissible under these rules:
> >
> > > (A) evidence of specific instances of sexual behavior by the alleged victim offered to prove that a person other than the accused was the source of semen, injury, or other physical evidence[.]

"The purpose of [KRE 412] is essentially to avoid inferences of bad sexual character being used to cast doubt on an alleged victim's claim of sexual assault, which is improper impeachment." *Perry v. Commonwealth*, 390 S.W.3d 122, 129 (Ky. 2012). The rule is meant to "protect the interests of a victim from the admission of evidence that is neither material nor relevant to the crime charged." *Howard v. Commonwealth*, 318 S.W.3d 607, 614 (Ky.App. 2010).

Evidence that victim had a mixture of three men's DNA in her underwear is precisely the type of evidence that the rape shield law was meant to exclude from trial. Although Bush argues otherwise, the primary purpose of such evidence would have been to show that victim engaged in prior sexual behavior

-15-

and had a sexual predisposition. Victim having potentially been a victim in prior incidents (as she was incapable of consent under Kentucky Revised Statutes (KRS) 510.110(1)(b)2.) would not exonerate Bush.

Bush did not deny that any sexual contact took place but claimed he was sleeping, and victim molested him. If the jury believed Bush's account, this would provide an alternative basis for how Bush's DNA could have potentially ended up in victim's underwear, providing a basis for how she could have tested positive for chlamydia without being infected herself without Bush being guilty of the charged offenses. Additionally, the agreed stipulation did not exclude someone else from being the source of the DNA and, hence, the source of the chlamydia. Therefore, we do not believe the trial court abused its discretion in excluding the evidence.

Turning to Bush's third argument, he contends the testimony of Detective Ross improperly bolstered victim's testimony. Bush acknowledges this argument is unpreserved and requests palpable error review pursuant to RCr 10.26. As such, we find no improper bolstering by Detective Ross. He testified that victim's testimony was consistent with her forensic interview at the Children's Advocacy Center (CAC). He did not testify that he believed victim's testimony or the statements she made during the CAC interview were truthful, only that they were consistent. The jurors could still compare various accounts. *See Roach v.*

*Commonwealth*, 313 S.W.3d 101, 112-13 (Ky. 2010) (explaining no palpable error for bolstering in pointing out that accounts were consistent with the officer's investigation, as the jury could do the same).

Bush's fourth argument is that the trial court erred in permitting testimony relating to the exercise of his constitutional rights regarding: (1) his decision not to answer the door when the police knocked; (2) his fee agreement with his attorney; and (3) his decision to invoke his right to an attorney. The first of these was preserved through an objection and Bush seeks palpable error review on the others. As we are discussing these arguments for the purpose of preventing their potential repetition, we need not delve into whether they are palpable errors as we assume they would properly be objected to during any retrial on remand.

Bush argues that it was improper for the trial court to permit testimony about his failure to answer the door for a "knock and talk" where the officers did not have an arrest warrant or a search warrant. Bush argues he had a constitutional right to remain in his home until either of those warrants was obtained. He argues that his failure to come out was not a resistance to apprehension equivalent to flight, so as to be admissible as consciousness of guilt.

The Commonwealth argues that Bush's conduct in failing to answer the door was properly admissible because the police had probable cause to effect his arrest and "evidence of flight and resistance of arrest is admissible to show a

guilty conscience." *Bush v. Commonwealth*, 726 S.W.2d 716, 716 (Ky.App. 1987). The Commonwealth argues that Bush could not remain in his house to evade arrest, relying on KRS 431.005(1)(c) and *Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 799, 157 L.Ed.2d 769 (2003). Both Bush and the Commonwealth rely on *Quintana v. Commonwealth*, 276 S.W.3d 753 (Ky. 2008), as supporting their position.

Various officers testified they went to Bush's home on the morning of February 23, 2018. After knocking and announcing at both the front and back doors for fifteen to twenty minutes and receiving no answer, several officers left the scene. However, Detective Jess Hamblin testified he decided to sit in his vehicle, parked up the street from Bush's residence, and observe the home. After fifteen to twenty minutes had passed, a female exited the front door of Bush's home, stood on the front porch, and looked up and down the street. Detective Hamblin then called the other detectives and officers to return to the scene. They continued to knock and announce but received no response. Eventually, police received a telephone call from Bush's attorney, who indicated Bush was ready to come out of his home. In all, police were at Bush's home for approximately one hour before he exited.

While the police ended up arresting Bush after he exited the residence, it is undisputed that whatever probable cause they may have had to effect his

-18-

arrest, they had not obtained a warrant. It is also undisputed that there was no exigent circumstance which would have prevented them from having the time to seek and obtain a warrant.

The Fourth Amendment to the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

As noted in *Quintana*, generally citizens cooperate when police knock on their doors, but "that is not always the case, as some citizens desire privacy and to be left alone to the enjoyment of their home." 276 S.W.3d at 757. The Court explained that "the officer who approaches the main entrance of a house has a right to be there, just as any member of the public might have." *Id.* at 758. The Court emphasized, however, that "any interaction between the police and the resident of a house in the course of a knock and talk must be consensual." *Id.* at 759. It noted that where "[t]here has been no finding of probable cause sufficient to grant a warrant, . . . the knock and talk is limited to only the areas which the public can reasonably expect to access." *Id.*

The Kentucky Supreme Court made it clear that this applies whether the citizen responds to the knock and chooses to talk, or determines not to respond

to the door and interact with the police; there is no requirement that citizens talk with the police:

> An officer's belief that someone is home and simply not answering the door does not change this analysis. The crux of the validity of the knock and talk procedure is that it is a consensual encounter in a place where the officer, like the public, has a right to be. Just as no resident is required to answer his door or respond to questions when the general public comes calling, so it is with a police officer, regardless of whether the failure to answer the door is intentional or the result of the resident's inability to hear the knock. Moreover, as any member of the public can be told and required to leave the premises, so can an officer. Unless an officer has probable cause to obtain a warrant or exigent circumstances arise, the intrusion can go no further than the approach to the obvious public entrance of the house.

*Id.* In *Milam v. Commonwealth*, 483 S.W.3d 347, 351 (Ky. 2015), the Court applied *Quintana* in holding that there was generally a right to privacy in a fraternity home, which the police acknowledged was not open to the public where the police knocked and rang before entering through an open door, citing to *United States v. Gomez-Moreno*, 479 F.3d 350, 356 (5th Cir. 2007), *overruled on other grounds by Kentucky v. King*, 563 U.S. 452, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011), for the proposition that "[w]hen no one answered, the officers should have ended the 'knock and talk' and changed their strategy by . . . seeking a search warrant[.]"

The Commonwealth would have us interpret *Quintana* as saying that because the police officers had probable cause to obtain a warrant, Bush had to answer the door. We disagree with the Commonwealth's interpretation, which is in opposition to all Fourth Amendment jurisprudence. The *Quintana* discussion of probable cause does not create a new exception to the warrant requirement, in which probable in and of itself can substitute for a warrant; instead, when properly considered in context, it simply provides that if police officers are denied contact when a knock and talk is attempted, and they have probable cause to obtain a warrant, they should obtain a warrant and can then demand entrance.

It does not matter whether the police knocked on Bush's home to talk with him or to effect his arrest; in either situation they still needed a warrant to make him come out.[2] The United States Supreme Court unequivocally held in *Payton v. New York*, 445 U.S. 573, 576, 100 S.Ct. 1371, 1374-75, 63 L.Ed.2d 639 (1980) (citations omitted), "the Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment,

---

[2] We recognize that the police did not engage in appropriate knock and talk conduct as they surrounded the house and knocked at Bush's back door, too, and appeared determined not to let anyone leave as shown by Detective Hamblin's "stake out" and decision to call the other officers back, with them persisting in knocking until Bush came out. This conduct was not consistent with their avowed purpose of conducting a "knock and talk" and the testimony about it is also problematic as it implied that the officers were convinced of Bush's guilt and viewed him as a danger to others or a flight risk, based on their behavior at that juncture.

prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest."

The Commonwealth's reliance on KRS 431.005(1)(c) and *Pringle* to justify the officers' actions is misplaced. KRS 431.005(1)(c) simply states the unremarkable and well-established fact that "[a] peace officer may make an arrest: . . . Without a warrant when he or she has probable cause to believe that the person being arrested has committed a felony[.]" While this proposition is correct, it is limited by the application of the Fourth Amendment. *Pringle* is consistent with *Payton* and states "[a] warrantless arrest of an individual *in a public place* for a felony . . . is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Pringle*, 540 U.S. at 370, 124 S.Ct. at 799 (emphasis added).

What officers may do in public is entirely distinct from how they may act when people are in their homes. As explained in *Payton*, felony arrests can properly be made in public, but the Fourth Amendment protects people from entry into their homes to make an arrest without a warrant or exigent circumstances.

As Bush had an absolute constitutional right to refuse to respond to the police and could not be forced to exit his home without a warrant, his refusal or delay in coming out cannot be used as evidence of his guilt. *See Commonwealth v. McCarthy*, 628 S.W.3d 18, 36 (Ky. 2021) (discussing how exercising constitutional rights cannot be used as evidence of guilt).

-22-

The typical cases in which a suspect's behavior is allowed as evidence of guilt involve violent actions in resisting arrest in public or exigent circumstances. *See Cherry v. Commonwealth*, 458 S.W.3d 787, 791 (Ky. 2015) (suspect in public failed to follow an officer's order to get on the ground and instead reached for his gun); *Doneghy v. Commonwealth*, 410 S.W.3d 95, 101 (Ky. 2013) (suspect continued to refuse to leave his home after a search warrant was obtained and fought with police to resist his arrest once they forced him to exit); *Bush*, 726 S.W.2d at 716 (suspect claimed he had a hostage with him and threatened to shoot himself); *Fallis v. Commonwealth*, 197 Ky. 313, 247 S.W. 22, 22-23 (1923) (suspect barricaded himself in his home with his son who had been arrested and who suspect had retrieved from the police by shooting at them, and suspect shot at the police who tried to apprehend him).

In *Fallis*, the Court explained:

> where one, after the commission of a crime, flees from the place, and either evades or actively resists arrest, all facts and circumstances showing the evasion or resistance of arrest, even though they disclose the commission of another crime, are competent against him upon a trial for the first offense. The sound reason for this is that the fact of evading arrest, and, a fortiori, the fact of actively resisting arrest, not only are competent to show the consciousness of guilt by the defendant himself, but his acts and conduct while so evading or resisting arrest are competent as showing his state of mind and the motive actuating him at the time of the commission of the first offense.

*Id.* at 24.

Bush's behavior does not come within this rule. He did not flee from committing the alleged crimes against victim. He took her home and returned to his own home. It was days later that the police appeared at Bush's home. He did not resist arrest in failing to exit his home where the police did not have a warrant or probable cause combined with exigent circumstances. Instead, he properly exercised his constitutional right to remain in his house until he decided to leave it. Bush's actions in choosing to peacefully remain in his home are not competent to show his state of mind, the motive behind the crimes against victim, or any evidence of guilt.

Additionally, any limited probative value regarding the facts surrounding Bush's arrest was more prejudicial than probative when it implicates his exercise of his constitutional rights. Accordingly, if a trial takes place on remand, facts relating to Bush's exercise of Fourth Amendment right to remain in his home and not respond to the police should not be elicited.

Bush's next argument is that his Sixth Amendment right to counsel was impinged upon through the Commonwealth being allowed "to use illegally-seized, privileged attorney-client documents against him during trial." Bush explains that the Commonwealth was allowed to repeatedly elicit details of his fee agreement with his attorney during its cross-examination of Bush, bringing it up

-24-

twice and referencing it during its closing argument, for the purpose of challenging Bush's statements that he did not know why he was being arrested.

The agreement between Bush and a prior attorney, dated February 20, 2018, stated, in relevant part, that the attorney was hired to represent Bush "[f]or the sum of $5,000.00" in "Pre-Arrest Allegations of Sexual Misconduct as alleged by [victim] on February 19, 2018 in Kenton County, Kentucky." This agreement was signed days before Bush's arrest. Bush argues this document was privileged and should not have been discussed during the trial. A photograph of the fee agreement was admitted as one of the Commonwealth's exhibits during its cross-examination of Bush. It was one of several photographs taken at Bush's residence during execution of the search warrant which were admitted into evidence.

The Commonwealth argues that previously it had stated that it would not bring up the fee agreement unless Bush committed perjury by claiming that he did not know why the police were present and this was appropriate impeachment evidence.

In his testimony, Bush testified he did not know why police were at his home on the morning of February 23, 2018. Therefore, the Commonwealth impeached Bush by showing him a photo of the first page of a fee agreement, asking him to confirm that the date of the document was February 20, and then asking him to confirm that "the content of why that attorney was retained is

because [victim] made sexual abuse allegations[.]" At that point, Bush again explained he did not know why the police were there and did not know that victim had disclosed anything. When asked "[y]ou didn't know, yet you hired an attorney and told [him] to represent you based on her disclosures?" Bush testified "[n]o, I told my lawyer what happened, and he told me what she was probably going to try to do to me." Bush also testified he thought the police might be at his house because he had some arrearages he needed to address.

> KRE 503(b) provides in relevant part as follows:
>
> General rule of privilege. A client has a privilege to refuse to disclose and to prevent any other person from disclosing a confidential communication made for the purpose of facilitating the rendition of professional legal services to the client:
>
> > (1) Between the client . . . and the client's lawyer[.]

There are five enumerated exceptions to the attorney-client privilege, KRE 503(d)(1)-(5), but none of these apply here.

We decline to evaluate Bush's claimed violation of the attorney-client privilege as a constitutional violation. There are several problems with doing so, not the least of which that Bush's Sixth Amendment right to counsel did not attach until after he was charged and that our Courts have never equated a violation of the attorney-client privilege with a violation of the Sixth Amendment. While we do

not dispute that there is a connection between these two rights,[3] we will evaluate

Bush's argument in terms of whether impeaching him with the fee agreement

violated his rights under KRE 503.

Generally, the fact that an attorney has been retained is not privileged

as the attorney-client privilege protects communications and not facts. *Upjohn Co.

v. United States*, 449 U.S. 383, 395-96, 101 S.Ct. 677, 685-86, 66 L.Ed.2d 584

(1981). However, the fee agreement at issue did more than show the mere fact of

retention; it also contained a communication regarding the subject matter of the

---

[3] General analyses of the connection between these rights have rejected the attorney-client privilege being a constitutional right. *See* 98 C.J.S. *Witnesses* § 335 (2022) (footnotes omitted) (explaining "[t]he attorney-client privilege is not a constitutional doctrine, and a violation of the privilege is not, of itself, a violation of the United States Constitution or its laws and treaties. While the privilege is not necessarily overridden in the interest of due process, in criminal proceedings, the privilege may implicate a defendant's Sixth Amendment right to counsel."); Alberto Bernabe-Riefkohl, *Another Attempt to Solve the Prior Restraint Mystery: Applying the Nebraska Press Standard to Media Disclosure of Attorney-Client Communications*, 18 CARDOZO ARTS & ENT. L.J. 307, 328 (2000) (footnotes omitted) (noting that "[a]lthough some courts have held that police intrusions into confidential client-lawyer communication can violate the defendant's Sixth Amendment rights under some circumstances, courts have consistently rejected the notion that the privilege has a constitutional dimension protected by the Sixth Amendment."); Michael Jay Hartman, *Yes, Martha Stewart Can Even Teach Us About the Constitution: Why Constitutional Considerations Warrant an Extension of the Attorney-Client Privilege in High-Profile Criminal Cases*, 10 U. PA. J. CONST. L. 867, 875-76 (2008) (explaining the connection between the Sixth Amendment right to counsel and the attorney-client privilege); 24 KENNETH W. GRAHAM & ANN MURPHY, FED. PRAC. & PROC. EVID. § 5472 (1st ed. 2022) (clarifying that the argument that the attorney-client privilege is constitutionally compelled is derived from a holistic analysis of the Bill of Rights). However, there are limited cases from outside our jurisdiction which have made a more direct connection between the two rights. *See Carter v. Maryland*, 149 Md. App. 509, 522, 817 A.2d 277, 284 (Md. Ct. Spec. App. 2003); *South Carolina v. Thompson*, 329 S.C. 72, 77, 495 S.E.2d 437, 440 (1998); *Bishop v. Rose*, 701 F.2d 1150, 1157 (6th Cir. 1983); *Illinois v. Knippenberg*, 66 Ill. 2d 276, 286, 362 N.E.2d 681, 685 (1977).

retention, which was memorialized. Allowing such content to be disclosed did more than impeach Bush; it was also evidence of his guilt that he sought legal advice regarding allegations of sexual misconduct before he was arrested or charged.

Pursuant to KRE 503, Bush had a right to frankly speak with his attorney, about confidential matters with the intention that they not be disclosed to third parties, "for the purpose of obtaining or furthering the rendition of legal services[.]" *Collins v. Braden*, 384 S.W.3d 154, 161 (Ky. 2012).

Although there is a paucity of case law addressing whether an individual's credibility can be impeached through use of a memorialized attorney-client communication, we believe this would be improper as there is no exception to the rule for impeachment purposes. In *The St. Luke Hospitals, Inc. v. Kopowski*, 160 S.W.3d 771, 777 (Ky. 2005), the Kentucky Supreme Court explained that the attorney-client privilege could not be cast aside based on a lack of alternative sources for the information, because such an exception was not written into the rule:

> KRE 503 specifically delineates the circumstances in
> which the privilege gives way to other considerations.
> Listed in KRE 503(d), the exceptions provisions, and
> clearly laid out is each instance when the privilege may
> be abrogated. Therefore, the rule itself articulates when
> the privilege, normally absolute, is overcome. Moreover,
> the enumerated exceptions indicate that the draftspersons
> of KRE 503 were well aware of how to create exceptions

to the privilege. Notably, there is no mention of necessity or lack of available alternatives as exceptions to the attorney-client privilege.

Similarly, in *Dunn v. Commonwealth*, 350 S.W.2d 709, 713 (Ky. 1961), which interpreted a previous version of the rule, the Court was unwilling to let the privilege be violated, even when there was no alternative basis to impeach the prosecution witness. In *Dunn*, a defendant wanted to cross examine a prosecution witness about prior inconsistent statements made by the witness when the defendant and witness were both being represented by the same attorney. The witness had previously told his attorney that he had not been involved in a breaking and entering; however, the witness testified in the defendant's trial that the witness had participated in the breaking and entering and implicated the defendant in that action. The trial court determined this communication was protected by attorney-client privilege, and not waived by the witness becoming a prosecution witness. *Id.* Our highest court upheld this decision, explaining "the protection afforded by the statutory provision is for the client's exclusive benefit and if the privileged communication, which is precluded in the attorney's direct testimony, can be obtained indirectly by cross-examination of the client, then the privilege afforded by the statute would be worthless." *Id. See Jones v. Commonwealth*, 249 Ky. 502, 60 S.W.2d 991, 994 (1933) (explaining "[t]he court properly refused to admit the testimony of F. J. Jones as to what John Lester stated

-29-

to him [regarding a murder], which was offered to contradict Lester. Jones, being the attorney of Lester, could not properly testify as to any communication his client made to him").

Although there may not be available alternative sources to impeach Bush's argument that he was not aware of why police came to his house, this does not mean that the privilege should be abrogated, and the Commonwealth be allowed to impeach Bush through the introduction of a privileged communication between him and his counsel. While on the surface, the introduction of the fee agreement was made to challenge Bush's credibility and honesty, this "impeachment" evidence could be interpreted as showing that Bush had a guilty conscience, knew very well that what he had done was illegal, but was seeking advice to avoid a conviction even before he was arrested or charged. Therefore, it was highly prejudicial. On remand, if facts surrounding Bush's arrest even come into evidence,[4] and if Bush denies knowing why the police came to his door, at most he could be questioned about whether he retained counsel on February 20th, and if he denied obtaining counsel, he could be impeached with a redacted fee agreement which eliminated the privileged communication.

---

[4] As we have explained previously, the manner in which the police continued to knock and surround Bush's home and testimony about Bush's refusal to come out as evidence of his guilt was improper. Therefore, testimony about the police arresting Bush would have to be much more limited upon any remand.

Bush next argues that his constitutional rights were impinged upon where the Commonwealth commented on his failure to talk to the detective about his defense that victim sexually assaulted Bush. Bush explains that when he was arrested and read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 467-73, 86 S.Ct. 1602, 1624-27, 16 L.Ed.2d 694 (1966), he chose to exercise his rights and asked for an attorney. Bush argues that the Commonwealth should not have been permitted to comment on his exercising his Fifth Amendment rights by using the fact of his silence against him. The Commonwealth failed to respond to this argument.

The United States Supreme Court case of *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), is directly on point. In *Doyle*, the Court considered the issue of "whether a state prosecutor may seek to impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Id.* at 611, 96 S.Ct. at 2241 (footnote omitted).

The Court explained that it is unfair to suggest to the jury that the defendant who elected to remain silent at arrest after being told of the right to do so and then testifies at trial regarding an exculpatory explanation for his perceived criminal actions must have recently fabricated this explanation or else would have given it when being questioned. The Court recognized that "[s]ilence in the wake

of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle*, 426 U.S. at 617, 96 S.Ct. at 2244 (footnote omitted). The Court reasoned that because *Miranda* warnings contain an "implicit assurance" that "silence will carry no penalty, . . . it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." *Id.* at 618, 96 S.Ct. at 2245 (footnote omitted). Therefore, the Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment." *Id.* at 619, 96 S.Ct. at 2245 (footnote omitted).

Our Courts have recognized the import of *Doyle*. *See Baumia v. Commonwealth*, 402 S.W.3d 530, 537 (Ky. 2013) (noting "the Court in *Doyle v. Ohio* held that impeachment through the use of post-arrest, post-*Miranda* silence does indeed violate due process"); *Hunt v. Commonwealth*, 304 S.W.3d 15, 35-36 (Ky. 2009) (explaining "[t]he Commonwealth is prohibited from introducing evidence or commenting in any manner on a defendant's silence once that defendant has been informed of his rights and taken into custody. . . . [I]t would be fundamentally unfair to allow a defendant's post-*Miranda* silence to be used for

-32-

impeachment"); *Romans v. Commonwealth*, 547 S.W.2d 128, 130 (Ky. 1977) (relying on *Doyle* for the proposition that allowing the Commonwealth to elicit over objection testimony that the defendant, after he was arrested and received his *Miranda* warnings, did not come forth with the explanation he ultimately relied on for his defense "was the most egregious error committed in the trial").

In *Spears v. Commonwealth*, 448 S.W.3d 781, 787 (Ky. 2014), the Court noted: "We agree with the general principle of *Doyle* that in a criminal case, some prejudice to the defendant will ordinarily flow from evidence suggesting that he declined to cooperate with the police and chose instead to remain silent until he could consult an attorney." While *Doyle*-type errors are subject to a harmless analysis test as noted in *Baumia*, 402 S.W.3d at 539, and *Wallen v. Commonwealth*, 657 S.W.2d 232, 233 (Ky. 1983), we need not engage in such an analysis as we are already reversing on other grounds.

Finally, Bush argues that his sentencing phase was tainted by incorrect time credit and service length information, but this error was not preserved. Bush argues that testimony about his eligibility for good time credit and how long he would be supervised if paroled was inaccurate because as a violent offender he could not receive good time credit and as a sex offender had a mandatory five-year period of supervision. Therefore, he argues the jury may have given him a longer sentence because it believed he could be released and

unsupervised sooner. The Commonwealth argues it has confirmed with Probation and Parole that Bush will be eligible for parole after serving 20% of his sentence and he is statutorily eligible for this as his crime constituted a Class C felony. Bush responds that the Commonwealth has misunderstood his argument as it was not about parole eligibility, and it should be treated as conceded.

Under KRS 439.3401(1), the definition for a "violent offender" includes "any person who has been convicted of . . . : (f) The commission or attempted commission of a felony sexual offense described in KRS Chapter 510[.]" Under KRS 439.3401(4): "A violent offender shall not be awarded any credit on his sentence authorized by KRS 197.045(1)(b)1. In no event shall a violent offender be given credit on his or her sentence if the credit reduces the term of imprisonment to less than eighty-five percent (85%) of the sentence." KRS 197.045(1)(b)1. is a reference to credit on a sentence for "[g]ood behavior in an amount not exceeding ten (10) days for each month served[.]" Therefore, Bush is correct that he was ineligible for good time and evidence given during the penalty phase of any trial should have properly explained how much time Bush would have to serve in addition to his eligibility for parole.

Additionally, KRS 532.043(1) provides that "any person convicted of . . . a felony offense under KRS Chapter 510 . . . shall be subject to a period of postincarceration supervision following release from: (a) Incarceration upon

expiration of sentence; or (b) Completion of parole." It specifies in KRS 532.043(2) that "[t]he period of postincarceration supervision shall be five (5) years." Therefore, Bush is correct that he will have to serve an additional five years of probation after his release.

We agree with Bush that the testimony about his eligibility for good time credit and the length of his supervision post-release was not accurately communicated. During the penalty phase of the trial, it is appropriate to have testimony about parole eligibility and the possible effects of sentencing credits, but such testimony must accurately reflect the law. *Cox v. Commonwealth*, 399 S.W.3d 431, 434 (Ky. 2013). Therefore, during the penalty phase of any trial on remand, these identified errors should be avoided and accurate testimony about Bush's parole eligibility and the possible effects of sentencing credits must be given.

Accordingly, we reverse the judgment and sentence of the Kenton Circuit Court as to Bush and remand.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Aaron Reed Baker
Frankfort, Kentucky

BRIEF FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Perry T. Ryan
Frankfort, Kentucky